91.—KINCHEN P. BOON, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

The act of 1843, prescribing the questions to be propounded to the juror upon his *voire dire*, is constitutional and valid.

The State is entitled to the ten peremptory challenges allowed by the penal code of 1833.

After a juror has answered in the negative the questions propounded by the act of 1843, it is competent for the prisoner to put him upon *triors*, for the purpose of showing that he is not indifferent; and the formation and expression of a *decided* opinion, as to the guilt or innocence of the prisoner, is a disqualification, notwithstanding it be founded on rumor or hearsay; and it is not necessary to prove personal prejudice or ill-will to the accused. It will be inferred from a deliberate opinion of guilt, once declared.

For the points decided, see the opinion delivered by the Supreme Court.

F. H. Cone and Y. P. King, for the prisoner.

Jno. M. Ashurst, Sol. Gen. for the State.

*By the Court*—Lumpkin, Judge.

This case comes up by writ of error, to a judgment of the Superior Court of Greene county, whereby the plaintiff in error was sentenced to be hanged for murder. In it, it is alleged that errors have been committed by the Circuit Court, in affirming the constitutionality of the act of 1843, which prescribes the form of the oaths to be administered in a criminal case to a juror, upon his *voire dire*, in allowing the State ten peremptory challenges, under the penal code of 1833 ; and in refusing permission to the prisoner to go before triors, for the purpose of proving by witnesses that one of the jurors was incompetent, by reason of his having formed and expressed an opinion, from hearsay or report, in regard to the guilt or innocence of the prisoner, notwithstanding he had answered in the negative both of the questions propounded by the act of 1843.

As to the constitutionality of the act of 1843, we are clear that Judge Merriwether, before whom this case was tried, was right ; and we have no difficulty in affirming his judgment on that point. It is entirely competent for the Legislature to prescribe what questions shall be asked the juror upon his *voire dire*, for the purpose of ascertaining whether or not he be indifferent. Nothing more is attempted by this statute. Indeed, this ground having been virtually decided, during the present term, in the case of Luke Robinson *vs.* The State of Georgia, it has been abandoned in the argument.

We concur, too, with the court below, on the second objection, and hold that the penal code of 1833, allowing ten peremptory challenges to the State, is no infraction of the 5th section of the 4th article of the constitution of Georgia, which declares that " trial by jury, as heretofore used in this State, shall remain inviolate." *John G. Jones* vs. *The State of Georgia,* argued and determined at this session, has settled that point. It is conceded, that " trial by jury, as heretofore used," means something more than a trial merely, by twelve men, regardless of the mode by which they may be selected. It protects the accused against the passage, by the Legislature, of any law which would materially trench upon his rights, or endanger his safety, by depriving him of any of those privileges guarantied by the common law. In 1798, when the present constitution was adopted, containing this provision, no man's life or liberty could be touched, for any offence whatever, unless found guilty on two trials, and by the verdicts of twice twelve men, or two juries, against him ; that is, one to find the bill or charge to be true ; and the other on the merits, to decide on full and legal proof adduced on both sides. And while we admit it is in the power of assembly to pass any act regulating merely the mode of trial by jury—provided that, in doing so, they do not destroy, or materially impair, the right—we should feel constrained to disregard any act which would deprive the citizen of the benefit of the security to which we have just alluded ; and this case is put by way of illustration. The ten peremptory challenges allowed by the penal code

is, after all, but an indifferent substitute for the common-law right of passing by the whole list, until the panel was exhausted; and such was the view taken of the matter by this court, in *Sealey's* case, determined at Americus.

The other question is one of paramount interest, and is simply this: Does the formation and expression of an opinion, by the juror, as to the guilt or innocence of the prisoner—from hearsay or report—evidence such a state of mind as to render him incompetent to try the cause? This point is one, we repeat, of great nicety and importance, involving, as it does, the life and liberty of the citizen, on the one side, and the duty of vindicating violated law, on the other. Courts find it exceedingly difficult in practice to adhere rigidly to the rules regulating criminal trials, in Great Britain. It has been well remarked, that amid the crowded population and busy pursuits of a community like England, divided, too, into classes, which take, perhaps, no very lively interest in each other's fate or concerns, and, it may be added, where the frequency of crime deprives it of the power to produce much public excitement, and where, moreover, comparatively few newspapers are published and circulated, it may not, perhaps, be very difficult, under these circumstances, to find a jury unaffected by rumor. But in an agricultural community like ours, of sparse population, identical pursuits, equal station, infrequent crime, and newspapers scattered far and wide, through all the length and breadth of the land, it has always been found a matter of much delicacy and difficulty—sometimes altogether impracticable—to procure a jury entirely unaffected by rumors, touching the transactions of a criminal nature upon which they are called to pass. Hence the continual effort, both on the part of the Legislature and of the courts, *to warp* the ancient rules of the law upon this subject. How desirable, then, it is, for this court to adopt some course which, while it preserves inviolate the principle that a jury shall be above all exception, will nevertheless accommodate itself to the times and the country, and secure both an impartial and successful administration of the laws.

To accomplish this end, all that is necessary, in our humble opinion, is fairly to interpret and honestly to administer the law as it now stands. Our Legislature has placed this matter upon the true footing. By the penal code of 1833, the first question propounded to the juror was; "Have you formed and expressed any opinion, in regard to the guilt or innocence of the prisoner at the bar?" Upon answering this interrogatory affirmatively, it was considered, *per se*, a principal cause of challenge, and the juror, without further inquiry, was pronounced incompetent, by the court, to sit on the trial of the cause. The Legislature, pressed by the inconvenience of making up a criminal jury, in many cases, concluded that an affirmative answer to the above question, ought not necessarily to disqualify a citizen from serving on the trial; that this opinion, which the juror is constrained to acknowledge he has expressed, might nevertheless have been, and, no doubt, often was, uttered, under circumstances which, when inquired into, would evince, to the satisfaction of all, that it constituted no sufficient objection to the juror; that, in fact, opinions were often *expressed*, which could not be properly said to have been *formed*, and which would readily yield to testimony offered in opposition to them. Consequently, the power of disposing of a juror thus summari-

ly, has been taken from the courts and referred to a *quasi* jury, composed of citizens of the county, before whom the nature and cause of the opinion shall be inquired into.   And if it appear, from the answers of the juror himself, or from other testimony, that he has formed and expressed an opinion of the defendant's guilt, out of ill-will or personal prejudice to the prisoner, or that he has such deep impressions or fixed opinions of the defendant's guilt, as will probably prevent him from rendering a fair verdict, he will be found not an indifferent juror, and challenged for cause.   If, on the other hand, the opinion he has expressed was a mere transient impression, so light and evanescent as not to be recollected frequently by the party himself—an opinion which takes its hue from the conversation of the last person present with whom he happens to talk, relative to the reports in circulation, evidently free from all settled bias, and resting upon no firm foundation—such a juror would do the accused justice, and would be found qualified by the triors.

The act, then, of 1843, has very properly repealed the 48th section of the 14th division of the Penal Code, and granted to the State and the prisoner the right to put the juror upon triors, and to prove him incompetent in the manner pointed out by law.   These triors, in case the first man called be challenged, are two indifferent persons named by the court ; and if they try one man and find him indifferent, he shall be sworn, and then he and the two triors shall try the next ; and when another is found indifferent, and sworn, the two triors shall be superseded, and the two first sworn on the jury shall try the rest.—1 *Bl. Com.* 363.

This order, and this only, can be pursued.   More than two triors, or more than two jurors, can in no case be sworn to try a challenge to a juryman ; but in the particular case already mentioned, one juror with two triors may be sworn for this purpose.

I have been particular in pointing out this proceeding, and have rather turned aside for that purpose inasmuch as it is likely to become very common in practice under the decision now made.

And may not a jury, thus empanneled, well be considered, what the law says they ought to be, *liberas et legales homines* ?   It is undoubtedly the high privilege of the accused to have their rights decided by twelve impartial men, who are free from the suspicion of partiality or prejudice. And the right of challenging every one on the list who does not come within that description, is a valuable privilege and ought to be strictly guarded. And better, after all, that ninety-nine guilty men should escape owing to the imperfection of this, like all other human systems, than that one innocent person should suffer for want of a fair trial, by an honest and unprejudiced jury.   The law in its humanity presumes every man innocent until his guilt is proved.   And should the public excitement against the defendant prevent a fair trial, it is good cause for continuing the cause. A legal quarantine is ordered until deliberation and tranquillity are restored.   Ought not the jury, then, in every case, to come into the box with minds free from preconceived opinions, and ready to receive impressions from the evidence delivered in open court, under the sanction of an oath ? While the Constitution of the State is binding on the conscience of courts, no juror can ever be forced upon the trial of a criminal, who is not perfectly indifferent, *omni exceptione major*.

The courts are not entirely agreed as to the mode in which the exam-

ination shall be conducted before the triors—whether by extrinsic evidence, or questions put to the juror himself, *or both.* It seems to be admitted on all hands, that a juror cannot be required to answer a question which would tend to his dishonor or discredit ; but that when it does not, he may be interrogated on his *voire dire :* and further, that he may *voluntarily* answer any question, the privilege of objecting being personal to himself only. We leave here this point for the present, as it is not directly made by the bill of exceptions.

The conclusion, then, to which we have come is this—that upon the reason of the thing, upon the authority of adjudged cases in England and in this country, and the general understanding of the Bench and the Bar, that the law is not chargeable with the injustice of admitting a juror to sit on the trial who has formed and expressed a *decided* or *substantial* opinion on the merits of the case. And it is immaterial whether this opinion has been formed from having been an, eye-witness of the *transaction,* or by having it proved by those who were ; or from rumors, reports and newspaper publications, or in any other way. It is still evidence of partiality or prejudice operating on the mind : and upon admission or proof of the fact, before triors, it is cause of challenge, and they will so return. And the law *presumptively* attaches the disqualification to the fact of forming and expressing an opinion ; and the burden is cast, then, upon the other party, of examining into the occasion, and weighing the evidence on which that opinion is founded, in order to restore the jurors in the judgment of the triors to fairness and impartiality.

We have been thus definite and specific, in laying down the rule, that our meaning may neither be misunderstood nor perverted.

Much ingenuity and legal learning has been displayed by the able counsel who argued in behalf of the State, in endeavoring to change the ancient principle of the law which attaches disqualification to the bare fact of having formed and expressed an opinion ; and it is attempted to superadd or engraft upon it the further fact that the expression of opinion by the juror must have proceeded from grudge or ill-will to the accused. And Hawkins is cited in support of this doctrine. By reference to that author it will be found that he has been misapprehended. He says that " *it hath been allowed a good cause of challenge that a juror hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like.*" And adds : " Yet it hath been adjudged that if it shall appear that the juror made such declaration from his knowledge of the cause, and not out of any ill-will to the party, it is no cause of challenge." (Book 2, ch. 43, sec. 28.)

Now, it will be clearly seen that Hawkins sanctions expressly, in the *first* paragraph quoted, the universally received doctrine as laid down in *Brooke's case,* (1 *Salk.* 153,) and ruled as law ever since, viz : that to entertain and express an opinion of the guilt of the accused, before trial, manifested a state of mind unsuited to allow a fair defence. But that if the person made such declaration upon his knowledge of the affair, or as it is more quaintly expressed elsewhere, because he knows the verity of the matter, *and not out of ill-will,* it is no cause of challenge : and for the obvious reason, that the latter declaration was of itself no disqualification by the ancient law. By the statute of 1843, the formation of an opinion from a knowledge of the fact, is made a principal cause of challenge ; our

Legislature rightly judging that the contrary doctrine was better adapted to the age of the 7th Henry, in which it originated, than the middle of the 19th century. It is well worthy of remark, however, that the act of 1843, framed professedly with a view to enlarge the grounds of competency by restricting the disqualification, *as to the court,* to a knowledge of the fact on the part of the juror has, in truth, curtailed the competency, if indeed this doctrine of the Year Books had not ceased already to be law.

In order to tranquilize, if possible, the feverish anxiety of the public mind as to the mode of selecting a criminal jury, to fortify and render stable the conclusion to which we have come, in this case, as well as to furnish beacons and landmarks to guide all who may be concerned in the administration of this branch of the law, I have availed myself of the brief time allowed to prepare this opinion to advert to a few leading adjudications upon the principles discussed. Coke says that the rule of law is, " that the juror must stand indifferent as he stands unsworn."— *Coke Lit.* 155, *b.*

Bacon, under the head of what partiality in the juror is a good cause of challenge, refers to the words of the writ of *venire* as the test of qualification. It requires such to be summoned " *per quos rei veritas melius sciri poterit,* and *qui nec* the plaintiff, *nec* the defendant, *aliqua affinitate attingunt ;*" which words, he says, contain all causes of objection from partiality or incapacity, consanguinity and affinity ; therefore if the juror be under the power of either party, as if counsel, servant of the robes or tenant, he is expressly within the intent of the writ ; *so if he has declared his opinion touching the matter.*—3 *Bac. Abr.* Letter E. 5.

Reeves, in his history of the English Law, (1 vol. p. 329,) thus states the rule : " When the jurors appear, then the exceptions to them are to be taken. These were of various kinds. Any enmity against a party— any friendship with him, was a good exception. Being a servant, familiarity, consanguinity, affinity, unless the connexion was equally with both parties ; being of the same table or family ; under the power of a party so as to be benefited, owing suit or service ; being counsel or advocate—all these and *many others* were good causes of exceptions to jurors. How particularly cautious is the law, as appears from the general principles laid down by these elementary writers, to see that the jurors in every respect be free from all impressions and influences : like Cæsar's wife, were even above suspicion.

Fries having been convicted of treason for levying war against the United States after a trial that lasted fifteen days, moved by his counsel for a new trial, on the grounds : 1st. That there had been a mistrial ; and, 2d. That there had not been an *unbiased* and *impartial trial.* The facts on the second ground in support of the motion were, that Rhodes, one of the jurors, declared that he was not safe at home for those people, (meaning the insurgents.) That they ought all to be hung, and Fries particularly.

In answer to the second ground the attorneys, in behalf of the prosecution, contended that the declaration of the juror related to the general insurrection, and they were not applied to the particular issue he was sworn to try ; *and they were not personally vindictive as to Fries.*

After a solemn consideration of the subject, IREDELL, *Justice,* de-

livered his opinion in favor of a new trial, on the second ground of objection : that one of the jurors had made declarations, as well in relation to the prisoner personally, as to the general question of the insurrection, that manifested a bias or predetermination that ought never to be felt by a juror.—3 *Dallas Reports*, 518.   How calm—how nobly firm ! and that too when a stab was aimed at the very heart of the republic ! when the column of liberty, so recently reared in this country, tottered to its base under the parricidal blows of these desperate men.

The trial of Col. Burr for treason in 1807, on account of the " celebrity of the party ; the learned and profound doctrines which were so ably and elaborately discussed by such eminent counsel, and the great talents of the court," have given an importance and value to the doctrines there discussed and decided ; surpassed certainly by none other in the history of celebrated state cases.   And the very point involved in this opinion came directly under the consideration of the court.

Mr. MacRae, who was a counsel for the United States, insisted that to disqualify a juryman, there must be *ill-will* to the party accused—a *personal prejudice* against him.

Mr. Wirt, who argued on the same side, seemed to think that the degree of impartiality required was unattainable, however right in the abstract.   That it was a good rule for Utopia, or Araby the Happy, or as a standard of theoretic perfection.   But on those who have human passions, it was in vain to expect it to operate.   And that for jurors to come into the box without any impression ; with minds as pure as the unsoiled snow on the virgin lap of Diana ; such a jury could not be obtained unless it was to fall directly from heaven.

Mr. Hay, the district attorney, took broader ground, and maintained that that jury may be said to be impartial who entertain the common sentiments and feelings of a great majority of the people, and who are taken from the mass of the community ; and that to say they were not, were to pronounce a libel on the State.

I will pass by the reply of Mr. Wickham, who, in answer to the argument of Mr. MacRae, urged that it was evidence of prejudice against a man, to believe and declare him guilty ; and who contended that if the standard of competency, stated by Mr. Hay, was true, that is the common sentiments of the mass of the people, that the student might dismiss his black letter, in search of legal principles, and resort to barbecues, and other places of amusement, to learn the common sense of mankind.

Chief Justice Marshall, in delivering the opinion of the court, says : " The great value of the trial by jury certainly consists in its fairness and impartiality.   Those who most prize the institution, prize it because is furnishes a tribunal which may be expected to be uninfluenced by any undue bias of the mind.

" I have always conceived, and still conceive, an impartial jury as required by the common law, and as secured by the Constitution, must be composed of men who will fairly hear the testimony which may be offered to them, and bring in their verdict according to that testimony, and according to the law arising on it.   This is not to be expected—certainly the law does not expect it—where the jurors before they hear the testimony have *deliberately* formed and delivered an opinion,

that the person whom they are to try is guilty or innocent of the charge alleged against him.

" The jury should enter upon the trial with minds open to those impressions which the testimony of the law of the case ought to make ; not with those preconceived opinions which will resist those impressions.

" All the provisions of the law are calculated to obtain this end. Why is it that the most distant relative of a party cannot serve upon a jury ? Certainly, the single circumstance of relationship, taken in itself, unconnected with its consequences, would furnish no objection. The real reason of the rule is, the law suspects the relative of partiality—suspects his mind to be under a bias—which will prevent his fairly hearing and fairly deciding on the testimony which may be offered to him. The end to be obtained is an impartial jury. To secure this end a man is prohibited from serving on it whose connection with a party is such as to induce a suspicion of partiality. The relationship may be remote ; the person may never have seen the party ; he may declare that he feels no prejudice in the case ; and yet the law cautiously incapacitates him from serving on the jury ; because it suspects prejudice—because, in general, persons in a similar situation would feel prejudice.

" It would be strange if the law were chargeable with the inconsistency of thus carefully protecting the end from being defeated by particular means, and leaving it to be defeated by other means. It would be strange if the law would be so solicitous to secure a fair trial, as to exclude a distant, unknown relative from the jury, and yet be totally regardless of those in whose minds feelings existed much more unfavorable to an impartial decision of the case.

" It is admitted that where there are strong personal prejudices, the person entertaining them is incapacitated as a juror ; but it is denied that fixed opinions respecting his guilt constitute a similar incapacity. Why do *personal prejudices* constitute a just cause of challenge ? Solely because the individual who is under their influence is presumed to have a bias on his mind, which will prevent an impartial decision of the case, according to the testimony. He may declare that, notwithstanding these prejudices, he is determined to listen to the evidence and be governed by it ; but the law will not trust him. Is there less reason to suspect him who has prejudged the case ? who has deliberately formed and delivered an opinion upon it ? Such a person may believe that he will be regulated by testimony, but the law suspects him, and certainly not without reason. He will listen with more favor to that testimony which confirms, than to that which would change his opinion. It is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in the case.

" It is for this reason that a juror who has once rendered a verdict in a case, or who has been sworn on a jury which has been divided, cannot again be sworn in the same case. He is not suspected of personal prejudices, *but he has formed and delivered an opinion, and is therefore deemed unfit to be a juror in the cause.* Were it possible to obtain a jury without any prepossessions whatever, respecting the guilt or innocence of the accused, it would be extremely desirable to obtain such a jury ; but this is perhaps impossible, and, therefore, will not be required. The opinion which has been avowed by the court is : that light impressions,

which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror ; but that those strong and deep impressions which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him. *Those who try the impartiality of a juror, ought to test him by this rule. They ought to hear the statements made by himself, or given by others, and conscientiously determine, according to their best judgment, whether, in general, men under such circumstances ought to be considered as capable of hearing fairly, and of deciding impartially upon the testimony which may be offered to them ; or as possessing minds in a situation to struggle against the conviction which that testimony might be calculated to produce ? The court has considered those who have deliberately formed and delivered an opinion, on the guilt of the prisoner, as not being in a state of mind fairly to weigh the testimony, and, therefore, as being disqualified to serve as jurors in the case.*

" *The question must always depend on the nature and strength of the opinion.*"

I have extracted a large portion of this opinion. I am strongly tempted to insert the whole, hoping and believing that its tendency would be to arrest that spirit of innovation, which, in its zeal to punish and prevent crime, would insidiously undermine, or strike down with murderous hand, an institution, venerable alike for its antiquity and intrinsic worth. Courts and Legislatures would do well, before entering too rashly upon the work of reform, to pause and ponder seriously the sentiments of this pure and spotless man, and eminent jurist. As a patriot, he appreciated the blessings of the institutions which he fought to secure. He reflected deeply, as he states himself, upon the grave topics involved in the discussion, and the result is recorded in this opinion, with a perspicuity and force peculiar to the clear and discriminating mind of their distinguished author. The principles established by this decision may be rudely overthrown or disregarded : they never can be successfully answered.

It is true that our Constitution merely preserves the trial by jury, as heretofore used in this State, inviolate forever, and does not, in express terms, guaranty an impartial jury ; yet, as it has been often ruled, *ex vi termini*, it is embraced in its spirit and provisions, as much as that the *judges* shall be impartial men. It would be thought, and deservedly, a monstrous outrage, for a judge to preside in a case, who was daily heard at every corner of the streets engaged in violent altercations to prove the guilt of his hapless victim. Can it be less so in the jury, who are made judges both of the law and the facts in the case ?

In every State of the Union, so far as we are informed, the declaration of a settled opinion against a prisoner is deemed a good cause of challenge.

In *ex parte* Vermilyea, Judge Woodworth, before whom the cause was tried, says :

" All experience goes to prove the infirmity of human nature is such, that we cannot at pleasure get rid of preconceived opinions. The question is not how great is the bias, but does any exist ? The least is suffi-

cient to exclude. Can the source from whence it is derived be material ? As to the accused, it is the same thing whether the bias proceeds from a preconceived opinion, or malice and ill-will. *Why, then, superadd the necessity of proving malice or ill-will? Without it*, the parties do not contend on equal ground ; by requiring it to be proved, in order to exclude the juror, it only shows the disparity to be greater."—6 *Cow. Rep.* 563-4, see above *John.* 316 ; 8 *John.* 445 ; 1 *Cow.* 432.

In *Rice* vs. *The State of Tennessee*, the Supreme Court say : '

" The question touching the manner of testing the qualification of juries, is one of great importance. The right of trial by an impartial jury is guarantied to every man. The mode of arriving at that degree of impartiality contemplated by the Constitution, should be fixed and uniform. Most persons who have witnessed the trial of an accused for crime, in counties of small population, can scarcely have failed to observe how few called as jurors stand indifferent towards the prisoner. If he be a stranger, or an obscure individual, the more certainly will that evidence of prejudice be exhibited. Men of wealth or of consequence in society when accused, though they may have to encounter the force of prejudice, nevertheless have their friends and adherents.

" From the bill of exceptions in the present case, we are to take it as proved, that the jurors, when called, declared on oath, that they had formed opinions touching the guilt or innocence of the prisoner ; that they had expressed their opinions ; and to the jurors thus impressed the question is severally put: Do you think, nothwithstanding your opinion, you are in a condition to try this cause impartially ?

" What is the condition of a juror when such a question is propounded ? He will feel that it is an appeal made to his pride and magnanimity. He will naturally imagine he can—nay, he will suppose he has already divested himself of his prepossessions ; and he will answer in the affirmative. But who that has taken the slightest view of human nature, can help seeing that immediately upon hearing a repetition of the same evidence which first raised his prepossessions, they will return upon him ? Or, placing himself on his resolution, he will err on the other side, to reject the evidence, which, but for the appeal to his pride, would have had its due weight. Hence the wisdom of the rule that jurors should be *omni exceptione majores*. Prejudice or partiality operates as a disqualification to a person called as a juror. If he, on inquiry, discloses the fact when examined to the point, he ought not to be put to prisoner. It is unjust toward the accused, because he is sensible he has difficulty to encounter which the Constitution designed to guard him against ; and it is unjust to the juror thus to force upon him the double duty of guarding against his formed partialities or prejudices, while he is charged, perhaps, with the life of the accused. The duty upon the juror is sufficiently weighty, when he comes into the box, to receive impressions from the evidence he may learn."

The next case to which I shall refer, is that of *Alexander Lithgow* vs. *The Commonwealth, Virginia Cases*, 397. And before proceeding to the examination of the main point decided by the General Court, I would observe that an incidental question arose, similar to that discussed by the Solicitor-General, Col. Ashurst. He contends, inasmuch as the record shows that a jury was selected, leaving the prison-

er's peremptory challenges unexhausted, that although he should be of the opinion that the court erred in putting Armstrong upon him, still, the judgment should not be reversed on that account. And authority may be found to that effect. We adopt, however, the view of the General Court of Virginia, expressed in Lithgow's case. Christopher Irvine, one of the *venire*, and the first on the panel, was, upon being called, challenged by the prisoner for cause, and his challenge being overruled, the prisoner, in order to exclude him, was put to his peremptory challenge.

"If," say the court, "it was error, under the circumstances stated, to overrule the challenge for cause, this court is of the opinion, that the subsequent exclusion of Irvine does not cure it, *although the record shows that the prisoner had not exhausted his peremptory challenges, even when a jury was finally obtained.* To procure the reversal of a judgment of conviction, for an error in point of law, it is not required to show that the prisoner was actually injured by it. It will be enough if the court can be satisfied that he might have been injured. But this court do perceive how this error might have operated to the prejudice of the accused. He might have thereby been prevented from exercising, to its utmost extent, his right of peremptory challenge, as a vain and useless thing. He might have thought it better, after that decision, to take the first jurors that offered, rather than excite suspicion against himself by challenging as many as the law allowed, when he had reason to believe that, after all, persons in the same situation as Irvine, would compose his triors; and he might have been thereby deterred, and probably was deterred, from making similar objections to others of the *venire.*"

The case principally made by the bill of exceptions is then considered, and it was this : Irvine, the first juror on the panel, being sworn on his *voire dire*, said, in substance, that he had formed, and frequently expressed, a decided opinion of the prisoner's guilt ; that if empanneled in this cause, he should certainly go into its trial with an opinion, generally, that the prisoner was guilty of the charges imputed to him ; but he believed that he would be governed by the evidence, although he was unwilling to trust himself.

"Upon this case," say the court, "as we understand it, the prisoner's objection to Irvine, for cause, ought to have been sustained. He was not a proper juror, because he would have gone into the trial with a preconceived opinion and bias against the prisoner, formed, possibly, as well from the evidence he had heard, as from public rumor, and therefore could not be expected to deliberate and decide with that impartiality which is always expected in a jury."

Upon a careful examination of the English authorities, we do not find that any of them conflict with the opinion now delivered. The forming and expressing a deliberate opinion seems, on the contrary, to have been always allowed as a good cause of challenge, provided the fact was made to appear by evidence. This is sufficiently proved by Peter Cooke's case (13 State Trials) as well as other authorities, *and is admitted by Hawkins*, b. 2, c. 43, s. 28, in the passage cited by the Attorney-General. The qualification that "if the juror has made such declaration, from his knowledge of the cause and not out of ill-will to the party, it is no cause

of challenge," "does not vary the case, nor prove that by the law of England, the expression of an unqualified opinion of another's guilt without a personal knowledge of it, *is not at least prima facia evidence of partiality.* Expressing the same opinion without personal knowledge, argues, to say the least of it, a readiness to believe unfavorably of the prisoner, which may afford good reason for presuming ill-will and prejudice."

The same point came under review again, in the case of *Hudson Sprouce* vs. *the Commonwealth, Virginia Cases,* 375. This was a writ of Error to a judgment of the Superior Court of Law for Albemarle county, whereby the plaintiff in error was sentenced to be hanged for murder. From the bill of exceptions, it appeared that Abraham Wrant, when examined on his *voire dire,* stated that he had heard the subject of the trial frequently in the county ; that he cannot now say whether the persons, from whom he has heard the relations of the evidence, were present at the examining court, or not. But upon such relations, which he believed to be true, he has formed a pretty substantial opinion, and expressed the same more than once ; that he now thinks, notwithstanding the formation and expression of such opinion, he could, as a juror, do justice to the prisoner ; that he was not at the examining court, nor had he heard the evidence in the case, nor conversed with any of the witnesses ; that the opinion which he had taken up and frequently expressed, was founded in rumor in the county ; that he felt no prejudice, and was open to conviction

Upon this statement the judges were unanimously of the opinion, that the challenge to the juror *Wrant,* was good in law, and ought to have been sustained. They add :

" In England it has long been an established princip'e, that if a juror has formed and delivered an opinion, it is good cause for a principal challenge. And although a juror may believe, after an opinion so formed and expressed, he will be regulated by testimony ; yet the law suspects him, and certainly not without reason. *There is nothing in the peremptory challenges of the prisoner not being exhausted by him.*"

It was assumed in the argument, that the courts of South Carolina had uniformly held a different doctrine from that now delivered by this court. There is certainly some misapprehension in this notion. On the contrary, it has nowhere been established upon a more solid basis. John E. Baldwin, tried and convicted, before Judge GRIMKE, in Charleston, moved for a new trial upon several grounds. The constitutional court were divided upon some of the points involved in the motion. Mr. Justice Bay thus expresses himself :

" Loose, random reports out of court, never can nor ought to be thought of sufficient consequence to merit a serious consideration in the sanctuary of justice. If, however, any man summoned as a juror, should be so lost to all sense of duty, as to form a hasty opinion upon vague and idle reports, and to express it, such man, upon due proof of such declarations, should be rejected as unworthy to sit upon a trial where the life of a man was concerned. Indeed, it appears to me that such conduct would not only be highly offensive in the eyes of God, but a high misdemeanor in law, for which he ought to be severely punished."—*S. C. Rep.* 321.

In the *State* vs. *Benton,* (*Dev. and Batt. Rep.* 208,) the defendant

having been convicted capitally, moved a new trial on this ground, (among others therein set forth,) that the court erred in disallowing the prisoner's challenges for cause, to the jurors, who swore that they had formed and expressed an opinion relative to the prisoner's guilt or innocence. Judge GASTON, in delivering the opinion of the Supreme Court, thus expresses himself:

" The position, that a juryman may not be challenged, because of an opinion made up and declared on the very matter to be tried, unless such declaration can be referred to personal ill-will, seems to us not well founded. The indifferency required by the law, must be one of the judgment, as well as of the passions, such as enables the trior to find the facts truly according to the evidence ; therefore, a mind not thus indifferent, but inclined against one or the other of the parties to the issue, whether from a personal dislike or a previous determination on the controversy, has to him an unfavorable disposition, or in the language of the olden times, an ' ill-will.' " Thus Breton, speaking of the prisoner being permitted to challenge a juror, because he was one of the indictors, gives as a reason, because " there was a presumption, that all who indicted him still bear the same *ill-will* against him."

" In the answer of Judge Chase to the articles of impeachment against him, he lays down as a rule, that the laws presume indifferency of every juryman, until the contrary appears ; and that the presumption is not removed by general expression of opinion, as to the criminality of the act, of which the party is accused ; but he distinctly admits, that this presumption is repelled by the declaration of an opinion that the party is guilty of the offence charged.

" From a decided opinion declared, the law infers a bias ; and the belief of the person so biased, that he can rise superior to its influence, does not repel the legal inference, *nor ought it ;* for it not unfrequently happens, that those who are most confident in the ability of their understanding to triumph over the obstacles in the way of its free exercise, and of the ascertainment of truth, owe this confidence to their ignorance and the stubbornness of prejudice, and may be the least qualified for the discharge of this, to all persons and at all times, perilous undertaking.

" The law excludes from the jury-box, as far as the infirmity of human nature, and the imperfections of human institutions will permit, any bias, partiality or prejudice which may prevent the verdict from being a finding of the truth, upon the proofs. It knows that honest, but weak men, may confidently believe, that they are governed by the evidence, when they are misled by their prepossessions ; aware of the difficulty with which the understanding emancipates itself from the thraldom of opinions, once definitely formed and declared, it pronounces those unfit for the free examination of a controverted matter, who have thus prejudged it. But the law would do violence to the deductions which the observation and experience of every day furnish, if it held that any impression inducing assent for the moment, to the existence of a supposed fact, disqualified the understanding from entering upon a grave inquiry into the actual existence of a fact, with perfect freedom. Impressions short of full belief, opinions not definitely made up, or depending upon the supposition, that matters shall turn out as they have been represented—all of these may throw impediments in the way of impartial deliberation, and furnish cause to suspect that the juror may lean more favorably to the one than the

other party in the issue; and, therefore, *in all these cases, the law, by means of a challenge to the favorer, authorizes an inquiry, whether, in truth, they have produced this bias.*"

We deem it unnecessary to extend this investigation further. The foregoing momentous principles can never be successfully controverted. To overturn them, is to respect the deep foundations of criminal jurisprudence itself. It is to return to the rude and barbarous ages, when counsel was refused to a prisoner charged with a capital crime ; when the privilege was denied him to prove his innocence by witnesses; and when he was pressed to death by heavy weights, for challenging, peremptorily, a greater number of jurors than he was lawfully entitled to. Such inhumanity is now deservedly repudiated by the civilized world. It has passed away with the fire and faggot, the thumb-screws, and the inquisition, and I sincerely trust, never to be re-established. Occasions might occur, as did in Britain, during the rebellion of 1715 and 1745, when, from the necessity of the case, their fundamental principles would have to be disregarded. In such an emergency, the maxim, "*salus populi suprema lex,*" would be the law of the case. An alien is entitled to be tried by a jury *de medietate linguæ,* or composed one half of foreigners, provided that number can be found in the place. Still, if such a jury cannot be found, he must be tried. It would be a calumny upon the State, to say that she is incapable of affording her citizens a fair trial. At least, the present case presents no such necessity as would warrant the court in bending rules ordained by the most eminent judges, to shield the innocent and not, as it is supposed by many, the devices of crafty counsel, to defeat the administration of criminal justice. On the contrary, after the most deliberate consideration, to pronounce this objection insuperable ; for, however unwilling we may be to see the guilty escape, we are still more so to establish a precedent, which would jeopardize the safety of the innocent.