## John Warren *versus* The Commonwealth.

37　45
140　560
37　45
178　500
37　　　45
22 SC　235

*Right of Commonwealth to challenge peremptorily, and to stand Jurors aside.—Effect of Intemperate Habits and Intoxication on the Crime of Homicide.*

1. The provision in the Criminal Procedure Act of 1860, allowing four peremptory challenges to the Commonwealth in all cases, is not in conflict with that portion of the Constitution which provides, " that trial by jury shall be as heretofore, and the right thereof shall remain inviolate."

2. It is not error to allow the Commonwealth to " *stand aside*" jurors, without immediately showing cause of challenge.

3. On the trial of an indictment for murder it is not error to reject questions, as to whether the prisoner was not generally drunk when out of work, whether he did not move more quickly when drunk than sober, to be followed with proof that he did move quickly on the occasion of the killing, and, as to the effect of liquor on his constitution and brain, when there was no proof of actual intoxication, or that he was out of work at the time. Nor was it error to reject a question relating to the acts and declarations of the wife, on the day when the murder was committed; they were not evidence in favour of the prisoner, and were irrelevant.

4. Though deliberation is an essential ingredient in the crime of murder in the first degree, yet, where the evidence shows repeated assaults by the prisoner, resulting in death to the victim, the want of it must be shown by competent evidence of a condition and state of mind in which it would be improbable that deliberation directed his acts. The law will not permit the want of deliberation to be inferred from the violent acts of the prisoner in the consummation of his crime.

5. A reasonable doubt must exist in the minds of the jury, as to the intent to kill, before they should find a verdict of murder in the second degree. It is not every doubt, however slight, that should have this effect.

ERROR to the Court of Oyer and Terminer of *Berks county.*

At the August Term of the Court of Oyer and Terminer for the county of Berks, held August 13th 1860, John Warren was arraigned on an indictment charging him with the murder of a woman who was unknown to the jury; and, on the 17th of Au-

gust, the jury returned a verdict of guilty of murder in the first degree.

Motions were then made for a new trial, and in arrest of judgment, which, on hearing, were overruled, and, on the 27th day of September 1860, he was sentenced to death.

This writ of error was, thereupon, applied for and allowed, and the case ordered to be heard at Pittsburgh, on the 21st of November 1860.

The errors assigned (all of which had been the subject of exception on the trial) were as follows :—

1. The court erred in permitting the Commonwealth to challenge William S. Allgaier, a juror, peremptorily. The said juror, as appears from the record, was called and duly sworn to make true answers to such questions as should be asked him, touching his competency to sit upon said jury. The counsel for the Commonwealth then asked the juror the following question : "Are you from conscience opposed to the punishment of death?" which question the said juror then and there answered in the negative. The counsel for the Commonwealth then challenged the juror peremptorily, which challenge was sustained by the court and the juror excluded from the box.

2. The court erred in directing William Rocholl, one of the jurors, to stand aside, until the panel was exhausted. The said juror, as appears from the record, was called and duly sworn to make true answers to such questions as should be asked him, touching his competency to sit upon said jury. The counsel for the Commonwealth then asked the juror the following question : "Are you from conscience opposed to the punishment of death?" which question the said juror answered in the negative. The counsel for the Commonwealth then requested said juror to stand aside until the panel was exhausted. To this the prisoner, by his counsel, objected, but the court overruled the objection and ordered the juror to stand aside until the panel was exhausted.

3. The court erred in overruling the question which the prisoner's counsel proposed to ask Jeremiah Focht, a witness called by the Commonwealth, viz.: "Whether Warren was not generally drunk when out of work?"

4. The court erred in overruling the question which the prisoner's counsel proposed to ask Fayetta Focht, a witness called by the Commonwealth, viz.: "Whether Warren does not move quicker when drunk than when sober?"

5. The court erred in rejecting the offer of prisoner's counsel to prove by William Kalbach "that Mrs. Warren came to Kalbach's at seven o'clock in the morning, before the commission of the homicide, and forbade Kalbachs to sell Warren liquor, telling them he was drunk and had abused her, and was then on a spree."

6. The court erred in rejecting the offer of prisoner's counsel to prove by Leah Kalbach " that Mrs. Warren pledged a watch at Kalbach's some time before, and that Warren got rum on account of it—took it out in liquor."

7. The court erred in rejecting the offer of prisoner's counsel to prove by Patrick Fagan, " the peculiar effect that liquor had on the prisoner four years ago; that, when sober, Warren was a quiet and peaceable man, but when he got liquor it had a peculiar effect upon him, making him violent, crazy, and ready to fight his best friend; that the witness could prove from repeated observation that liquor had this peculiar effect upon Warren's constitution and brain."

8. The court erred in their answer to the prisoner's fourth point, which was as follows: " If the jury believe that John Warren was in such a state of mind by drink, or from some other cause, which the jury can deduce from the evidence of his conduct and manner in killing the deceased, as to be unable to form a wilful, deliberate, and premeditated design to kill, then he is guilty of murder in the *second degree* and not of murder in the first degree." To which the court answered as follows: " If the jury believes that the prisoner was in such a state of mind, by drink, as to be unable to form a wilful, deliberate, and premeditated design to kill, then the homicide with which he is charged could not be murder of the first degree.

" Voluntary drunkenness is no excuse for the commission of crime, as a general rule. But in certain cases where it becomes material to inquire whether the act was committed deliberately or not deliberately, wilfully or not wilfully, the fact of the party charged with the act being drunk at the time of its commission, has been held to be a circumstance proper to be taken into consideration by the jury. A man may be so drunk as to be incapable of forming any intention, and yet capable of committing great violence. He is not irresponsible, criminally, because of his drunkenness, only in so far as intent is of the essence of crime committed by him when in that state. In a case of murder, if the jury was satisfied of his incapacity of will or of deliberation, growing out of drunkenness at the time of the murder done, it would be its duty to convict only in the second degree. Whether the prisoner was in such a state of mind—was so drunk at the time of the assault made by him upon the deceased, as to be unable to form a wilful, deliberate, and premeditated design to kill her—is a fact to be determined by the jury from the evidence in the case.

" This fourth point presents this inability to form a wilful, deliberate, and premeditated design to kill under another aspect of cause. It is this: [If the jury believe that the prisoner was in such a state of mind from some other cause than drink, *which*

[Warren *v.* The Commonwealth.]

*the jury can deduce from the evidence of his conduct and manner in killing the deceased,* as to be unable to form a wilful, deliberate, and premeditated design to kill, then he is guilty of murder in the second degree. We are free to confess that we do not know to what 'other cause' this points than to insanity, or to *delirium tremens,* or to *mania a potu,* which are forms of insanity produced by drunkenness. It would be a dangerous thing, as we conceive, for a jury to deduce such conclusions from the conduct and manner of an act of homicide. Barbarity, atrocity, fiendishness, utter disregard of man, publicity of the crime, indifference to its consequences in not seeking flight or concealment, a life of drunkenness, it seems to us, are not elements from which a jury could safely draw so grave a conclusion as that this prisoner from some 'other cause' was unable to form a wilful, deliberate, and premeditated design to take the life of the deceased.] It is for the jury, however, to draw conclusions for themselves. The facts are for the jury absolutely and exclusively. The court has no power over the facts of any case. The court may express an opinion upon facts, but that expression of opinion is not to bind the jury. If the jury can draw the deduction from the evidence as to the prisoner's conduct and manner of killing the deceased, or rather in killing her, that from some 'other cause' he was unable to form a wilful, deliberate, and premeditated design to kill her, then he would be guilty of murder in the second degree."

The error alleged in the paragraph above, printed in brackets, is this, that this answer was calculated to mislead the jury, and to produce the impression on their minds, that nothing but absolute drunkenness, at the time of the homicide, would reduce the grade to murder in the second degree. The prisoner was entitled to a clear and distinct answer, which is not given, but an argumentative one, calculated to insure his conviction.

9. The court erred in their answer to the prisoner's sixth point, which is as follows: "Unless it is clearly shown that *deliberation* was present, or if reasonable doubt of its presence remain, or unless it clearly appears that life was not taken in passion and tumult, or drunkenness, or a deranged state of mind arising from strong drink, the grade is fixed by the presumption of law as murder of the second degree." To which the court answers as follows: "The sixth point is also answered in the affirmative. This point is framed upon what is said by the Supreme Court of Pennsylvania in Kelly's Case, 1 Grant 492. Deliberation must be present in the mind of the slayer to constitute murder in the first degree. That must be clearly shown to be present, and when it is not clearly shown to be present, or where reasonable doubts of its presence remain, the crime is reduced to the grade of murder in the second degree.

[Warren *v.* The Commonwealth.]

"[The drunkenness, or the deranged state of mind arising from drunkenness, which are to have the effect of reducing a homicide, committed when the slayer is drunk or so deranged, to the second degree of murder, must be such drunkenness, or such deranged state of the mind arising from drunkenness, as renders the mind incapable of deliberation.]

"Passion and tumult being the circumstances under which a homicide is committed, if the passion and tumult were such as to negative or to raise a reasonable doubt of the existence of deliberation in the mind of the slayer, or of the intent to take life, they would reduce the grade of the homicide to murder of the second degree."

The error alleged in the paragraph above, printed in brackets, is this, that while the point is nominally affirmed by the court, its effect is explained away, so that the whole effect was to injure the prisoner's case with the jury.

10. The court erred in answering the prisoner's eighth point, which was as follows: "If the jury find the killing was the result of sudden passion, caused by any provocation, however slight, acting on a mind shattered by dissipation and long-continued indulgence in strong drink, to such an extent as to render the prisoner unable to master himself and form a cool and deliberate purpose to kill, the prisoner cannot be convicted of murder in the first degree. If any doubts are in the minds of the jury as to this fact, then their verdict must be for the lighter grade." "Answer. We cannot answer this point as we are requested to do. It assumes a state of facts of which we find nothing in the evidence."

The error alleged is this, that no other motive for the homicide having been shown, the jury had a right to infer provocation, even in the absence of positive evidence. The answer should have been in the affirmative.

*John S. Richards, A. L. Hennershortz,* and *C. P. Muhlenburg,* for the defendant, contended:

1. That, at the time of the formation of the Constitution of Pennsylvania, the Commonwealth had no peremptory challenges. The revised criminal code of 1860 gives this right, and is in violation of that part of the Constitution which declares that "the trial by jury shall be as heretofore, and the right thereof shall remain inviolate:" Commonwealth *v.* Jolliffe, 7 Watts 585.

If this right existed in the Commonwealth, it is gone after an attempt to show cause. In this case the answer of the juror showed that he was competent, and the Commonwealth was bound by it.

2. The right to stand jurors aside was an innovation on the common law, and was only permitted because the Commonwealth

1 WR.—4

[Warren *v.* The Commonwealth.]

had no right to peremptory challenges. If the law gives this right now, the reason for standing a juror aside until the panel is exhausted has ceased, and with it the right. With regard to this juror, the Commonwealth undertook to show cause, but failed. When the Commonwealth has commenced to show cause of challenge, but has failed to make out a cause, it is not competent for the attorney-general to stop short, and take the juror away from the prisoner: Commonwealth *v.* Lesher, 17 S. & R. 155. In The Commonwealth *v.* McGarby, tried in Philadelphia in 1829, the jurors were examined as here, and on answering affirmatively, were challenged by the Commonwealth.

3. The questions overruled by the court, as given in the third, fourth, sixth, and seventh assignments of error, were proper, as the evidence which they were intended to elicit would have tended to show the state of the prisoner's mind when the offence was committed. The whole case turned on this: every circumstance tending to show how his mind was affected by his habits of intemperance, was important as negativing a wilful, deliberate, and premeditated murder of an unknown person.

5. The question overruled, as stated in the fifth assignment of error, would have elicited important evidence. It would have shown that the prisoner's wife was in Hamburg, and that her meeting the woman who was afterwards killed, was accidental, and that she was a stranger to both Warren and his wife. It was also part of the *res gestæ* showing Warren's condition at the time. It occurred before Mrs. Warren met the woman, and could not have been manufactured.

8. The instruction assigned here for error was liable to mislead the jury, and did so, by producing in their minds the impression that nothing but actual drunkenness at the time of the homicide would reduce the grade to the second degree: Kelly *v.* The Commonwealth, 1 Grant's Cases 484.

9. In the instruction complained of in this assignment, the effect of the decision was explained away.

10. No other motive for the homicide being shown, the jury had a right to infer a quarrel or provocation inside of the shanty, and the prisoner was entitled to this instruction.

*James B. Bechtel*, District Attorney, with whom was *Samuel L. Young*, for the Commonwealth.

1. The Act of Assembly, allowing the Commonwealth to challenge peremptorily, is not unconstitutional. Trial by jury was established here by the Charter of William Penn to the first settlers, sec. 8, which allowed "reasonable challenges," citing 1 Col. Records 37; Constitution of 1776, C. 1, sec. 2 and 25; Constitution of 1790 and 1838, art. 9, sec. 6, to show that neither of them prohibited the enactment of laws relative to the selection,

[Warren v. The Commonwealth.]

impanelling, and challenging of juries, which is no part of the trial: the mode of trial is left to the legislature: McFadden v. The Commonwealth, 11 Harris 12; Pennsylvania Hall, 5 Barr 205; Dowling v. The State, 5 Smedes & Marshall (Miss. Rep.) 664; Cregin v. Brinton, 2 Strob. (S. C. Rep.) 487; Jones v. The State, 1 Kelly (Ga. Rep.) 610 and 618, 2 Kelly 173; Rafe v. The State, 20 Georgia 60; Jesse v. The State, Id. 156; Colt v. Eves, 12 Conn. 243; Flint River Steamboat Company v. Foster, 5 Ga. 194; 7 Ma. Rep. 500; Emerick v. Harris, 1 Binn. 416; McDonald v. Schell, 6 S. & R. 240; Thompson v. White, 4 Id. 135; Commonwealth v. Rogers, 16 Id. 243; Vannatta v. Anderson, 3 Binn. 417; Hoffman v. Locke, 7 Harris 57; Biddle v. Commonwealth, 13 S. & R. 410.

Every legal presumption is in favour of the constitutionality of an Act of Assembly: Resp. v. Dugent, 2 Y. 493; Commonwealth v. Smith, 4 Binn. 123; Bank v. Smith, 3 S. & R. 68; Eakin v. Raub, 12 Id. 340; Commonwealth v. Zephon, 8 W. & S. 382; Sharpless v. The Mayor, &c., of Philadelphia, 9 Harris 147.

2. As to the second error, they argued that the right of challenge given by the act, was in addition to the right to stand a juror aside. Before the latter right was allowed, the king had an unlimited right of challenge. It has existed in this state and England from the thirty-third year of Edward I.: Roberts's Dig. 339–40; Commonwealth v. Jolliffe, 7 Watts 585.

The two rights are not inconsistent; nor is the one waived by a question as to competency. Passing a juror over to the court or the other party, is no waiver of the right to challenge for cause: McFadden v. The Commonwealth, 11 Harris 16; Mansel v. The Queen, 92 E. C. L. Rep. 52.

The 3d, 4th, 5th, and 6th errors are not well taken. Drunkenness, to reduce homicide to the second degree, must be such as to incapacitate the prisoner to commit wilful, deliberate, and premeditated murder. It is no excuse, but is only evidence of the status of the prisoner's mind when the offence was committed: Penn. v. McFall, Addison 285; Wha. C. L. 369. As to the 8th and 9th assignments of error, the answer was as favourable as the prisoner could expect, and as to the 10th error, it is unsupported by evidence. It is not necessary to prove motive: Commonwealth v. Mosler, 4 Barr 264; Kilpatrick v. The Commonwealth, 7 Casey 198.

The opinion of the court was delivered January 28th, 1861, by

THOMPSON, J.—The first assignment of error in this case is to the allowance of peremptory challenges on the part of the Commonwealth. It was allowed pursuant to the provisions of the

[Warren *v*. The Commonwealth.]

37th section of the "Criminal Procedure" Act of 1860. Four such challenges are given to the Commonwealth by this act, in all cases, without regard to any distinction between misdemeanours and felonies.

The question is now presented whether the provision is in conflict with that portion of our constitution which declares "that trial by jury shall be as heretofore, and the right thereof remain inviolate."

This was an early fundamental principle with us. It appears in substance in the first constitution or charter by William Penn to the people of the colony of Pennsylvania : 1 Col. Rec. 37 ; so in the constitution of 1776, and it is in words the same in the constitutions of 1790 and 1838.

Those who might doubt the power of the legislature to enact the provision in question, will find many statutes in our books, since the first announcement of this fundamental rule of legal polity, seemingly more in conflict with its letter than the one under consideration, which have been often discussed, considered and sustained by our courts. I will notice a few of them. The Act of 1774, which conferred civil jurisdiction upon justices of the peace to the extent of £20, and the Act of 1810, further extending it to $100, together with the provision making the magistrate's judgment final under $5.34, are of this sort. The restrictions upon the enjoyment of the right of trial by jury, involved in the necessity of entering bail, as provided for in these acts for an appeal, although it cannot be doubted but that it is to some extent a clog upon the right, was never held to be an infraction of the constitutional provision, the ultimate right being retained : 1 Binn. 416, 6 S. & R. 240, 4 Id. 135, 16 Id. 242. Nobody now thinks of doubting the constitutionality of these laws : and the reason is that the right of trial by jury still remains.

In many of the states of the Union, the same principle has been announced, in regard to enactments for facilitating judicial business. I will cite but a few of them : Beers *v*. Beers, 4 Conn. 535 ; Colt *v*. Eves, 12 Id. 243 ; Stewart *v*. The Mayor and Citizens of Baltimore, 7 Mar. Rep. 500. I might very greatly extend the citation of authorities to the same point, but think it unnecessary.

The Arbitration Act of 1814 and 1836, and the various acts regulating the taking of judgments for want of affidavits of defence, are also of the same species of legislation, and have been uniformly sustained by the courts.

"Laws such as these," (the Act of 1810), it was said by Tilghman, C. J., in Biddle *v*. The Commonwealth, 13 S. & R. 410, "promote justice, and leave the existence of trial by jury unim-

[Warren *v*. The Commonwealth.]

paired, and that is all that is required by the expression in the constitution, 'that trial by jury shall be as heretofore.'"

It is a mistake that is often made, to suppose that every modification of its accompanying powers detracts from the right. This is too narrow and rigid a rule for the practical workings of the constitution and the rights guarantied by it in the particular in question. There is no violation of the right unless the remedy is denied, or so clogged as not conveniently to be enjoyed. But, in practice, the giving of bail, making affidavits, and entering appeals, has never been found so onerous as to amount to any serious derogation from the right. The framers of the constitution in which this right has been so sedulously guarded, undoubtedly knew and intended that legislation must provide the forms under which the right was to be enjoyed, and they meant no more than that it should be enjoyed under regulations which should not take away the right deemed necessary to order itself.

It was truly said by Woodward, J., in The Commonwealth *v*. Maxwell, 3 Casey 444, "that the constitution cannot execute itself. It is a plan or frame of government, which lays down certain fundamental principles according to which the several departments it calls into existence are to govern the people; but all auxiliary rules which are necessary to give effect to these principles must, from the necessity of the case, come from the legislature."

In 1 Mass. R. 451, this point is well reasoned. It is there said that the constitution gives to parties a right of trial by a jury of twelve free and lawful men; but the mode in which the trial is to be had is not detailed. That is for the legislature, to enact laws for the purpose, with power to alter them from time to time, as may be deemed conducive to the ends of justice.

But the very point of this exception has often been raised and determined against the exception here. In Darling *v*. The State, 5 Sm. & M. 664 (Miss. Rep.), it was said by the court "that the statute of Mississippi which *limits the number* of peremptory challenges in capital cases on the part of the prisoner, to twelve, is not an infringement of the clause of the constitution which provides that 'the right of trial by jury shall remain inviolable.'"

In Georgia, a statute allowing the state half the number of peremptory challenges allowed to the prisoner, was in several cases held to be constitutional, notwithstanding the existence of a similar provision to that of ours contained in it: 1 Kelly 610; 2 Id. 173; 20 Geo. R. 60–156. So the same thing is held in Connecticut: 12 Conn. R. 243.

A like doctrine is expressed by this court in re Pennsylvania Hall, 5 Barr 204. It was there said by Mr. Justice Rogers that the right of trial by jury, which is justly esteemed the palladium of our liberties, especially in criminal cases, must be preserved inviolate; but this claim has never been so construed as to pro-

[Warren *v.* The Commonwealth.]

hibit an alteration in the manner of choosing and summoning jurors, or in making any other alteration, whereby, in the judgment of the legislature, it is made a more effectual instrument for the advancement of justice and the preservation of our rights."

Peremptory challenges heretofore allowed to the Commonwealth in misdemeanours is of modern date, and I do not remember of a case in which its constitutionality was ever disputed on the ground that it interfered with the right of trial by jury. It would be difficult to prove that a limited number of such challenges by the Commonwealth necessarily deprives the prisoner of any of his rights. Impartiality is to be presumed, and is the right on both sides in a criminal trial. To attain this was undoubtedly the object of allowing challenges at all. Whatever, therefore, tends to this end and no more, surely takes away no right. The prisoner's right is to have a common law trial by a jury of twelve good, true, and lawful men of the county; and until it be proved that allowing the Commonwealth four peremptory challenges impairs that right, complaints and objections are not to be regarded.

But, is the act of challenging which always precedes the trial, properly, and, within the meaning of the constitution, part of it? Is not this simply organization, a form through which it is necessary to pass to arrive at a trial? That it is so is strongly asserted by Black, C. J., in McFadden *v.* Commonwealth, 11 Harris 12. And so it has been held by the Supreme Court of South Carolina, Cregan *v.* Bunton, 2 Strob. 487. This is a rational view of the subject, with the reservation, however, that the law of the organization be not such as to defeat the right. But then it would affect more than organization, and be contrary to the constitution.

The case of Jolliffe *v.* The Commonwealth, 7 Watts 585, cited by the prisoner's counsel, does not touch this point of the case so as to make any other view of it necessary to accord with it. It aids him in nothing as far as we are able to see.

But we shall pursue this branch of the case no farther. We are satisfied that the law in question is not unconstitutional in the particular alleged; that the practice under it deprived the prisoner in no respect whatever of his constitutional right of trial by jury. Nor did it in the least impair it, and we must therefore overrule this assignment of error.

2. The next alleged error was in the practice allowed the Commonwealth of "standing aside" jurors, as it is called, without immediately showing cause of challenge. This is a practice ancient and uniform, it is believed: 5 Bac. Abr. 365. In 2 Bac. Abr. 764, it is spoken of thus: "It hath also been agreed, and is now the established practice of the courts, that if the King

[Warren *v.* The Commonwealth.]

challenge a juror before the panel is perused, he need not show any cause of his challenge till the whole panel be gone through and it appear that there will not be a full jury without the persons so challenged: Co. Litt. 156; Vent. 309; 2 Hall, P. C. 271; 2 Hawk. 518." The same thing is to be found in a recent decision, Monell *v.* The Queen, 92 E. C. L. 92.

The practice descended to us, like many other customs, from the country whence most of our laws and customs were derived, as is proved by Gibson, C. J., in Jolliffe *v.* The Commonwealth, 7 Watts (*supra*).

We do not think the rule is changed by the allowance of peremptory challenges. The necessity for the practice will most probably be somewhat abridged by this law, but the rule itself we need not disturb. It justified the allowance in this case, and there was consequently no error in permitting it to be done.

3. The third, fourth, fifth, sixth, and seventh errors may be considered together. They all relate to offers of evidence of the same general character, overruled by the court and excepted to on the part of the prisoner. They may be stated in short to be the rejection of the following questions: First, " Whether the prisoner was not generally drunk when out of work?" Secondly, " Did he not move quicker when drunk than sober? with a view to follow it with proof that he did move quickly on the occasion of the killing." Thirdly, " To prove that his wife went to Kalbach's on the morning of the day on which the killing took place, and forbade him from selling Warren liquor, saying " that he was drunk and abused her.' " Fourthly, " That Mrs. Warren had pledged a watch sometime before for liquor, that Warren got more on account of it—took it out in liquor." And fifthly, " To show the effect liquor had on Warren, beginning several years back; in making him wicked and crazy, and that it had a peculiar effect on his constitution and brain."

The object of all this testimony was of course to raise an inference that the crime was committed under the influence of intoxication, and to such an extent as to deprive the prisoner of the capacity to deliberate, which the court throughout properly conceded was an essential ingredient in the crime of murder in the first degree. To reduce the grade of the crime, therefore, where the evidence on the part of the Commonwealth was such as to make out a *primâ facie* case of murder in the first degree, evidence showing want of deliberation, or, which is the same thing, an incapacity to deliberate, is of course proper to be received. But it behooves the prisoner, in a case where death is produced by repeated brutal assaults on a helpless person, at considerable intervals of time, resulting at last in death, to meet the question of premeditation by competent evidence and which would serve to show a condition and state of mind, in which

[Warren *v.* The Commonwealth.]

it was at least improbable that deliberation could have directed his acts. Unexplained, the case here was such that a jury could scarcely have failed, if they regarded their oaths, to find it a case of wilful and premeditated killing. There was no attempt to prove actual intoxication at the time. Could it have been inferred from the testimony offered?

That he generally got drunk when out of work was a matter of habit, not of fact. It did not prove either the fact of being drunk at the time, or that he had no work. It was the fact that was wanted—from that the inference of want of deliberation might have been drawn. But it was asked here to infer that he was out of work, and therefore drunk, because he was generally so when out of work, and hence to infer from the inferred drunkenness, that he could not act deliberately. This mode of proof the law will not sanction, and we need only state the proposition to demonstrate the fallacy of the attempt.

Again, that his habits of motion were quicker when drunk than when sober. This is of the same character as the last, and subject to the same objection.

What his wife said or did was not evidence in favour of the prisoner. It was hearsay; and her acts were irrelevant. This is a sufficient answer to the offer of evidence in regard to what she said at Kalbach's, and as to her acts in pledging the watch.

The last of these offers was to prove the effect liquor had on the prisoner, beginning several years back;—that it made him violent, and crazy, and quarrelsome with his friends. Had this been preceded or followed by proof of intoxication at the moment of the commission of the crime, it might have been proper. But it seems to us not to be distinguished in principle from the questions already disposed of. It was an effort to raise an inference of intoxication from the violent acts of the prisoner in consummating his crime, unaided by proof that that was the impelling cause to its commission. Of what avail would it be to show the effect of intoxicating liquors on the prisoner, and that, when taken to excess, it rendered him crazy, violent, and unmanageable, unless it had been shown that he had partaken of it in sufficient quantities to produce the effect? The consequences flowing from the ordinary use of intoxicating liquors amounted to nothing unless it was shown that they were the cause that produced the effect. The proof offered was intended to establish a certain relation between cause and effect. The effect of intoxication might have been established by well known theory, but it was put upon experience in regard to the prisoner—that it usually produced certain results upon him. It was not shown to have produced that effect in the case in hand. The effect was offered as a substitute for both cause and effect. There was no proof of intoxication, excepting as inferential from his acts proved. But, if allowed

[Warren v. The Commonwealth.]

to be proved in this way, it could always be by violent acts, in any one. This is not to be thought of. When the prisoner was arrested, a few hours after the commission of the crime, not a single witness spoke of him as intoxicated. In the absence of proof of this kind, the testimony, the substance of this bill of exception, was irrelevant, and properly overruled by the court.

We have carefully scrutinized the answer of the learned judge to the points put on the trial by the prisoner's counsel, and we discover no error whatever in them. They were clear, and presented the law of the case broadly and fairly. To the argument that the manner of killing was evidence of intoxication or insanity from "some other cause;" while the court very properly told the jury that "barbarity, indifference to consequences, and a life of drunkenness, it seems to us are not elements from which a jury could safely draw so grave a conclusion, as that the prisoner from 'some other cause' was unable to form a wilful, deliberate, and premeditated design to take the life of the deceased," yet he added, "it is for the jury to draw conclusions for themselves. The facts are for the jury, absolutely and conclusively." This gave the prisoner a full and fair chance under the arguments of counsel, which would no doubt have been effectual to have saved him if there had been ground from which to infer insanity from any cause.

We need not notice at length the answers to any of the other points, further than to say, we have carefully examined them, and find nothing wrong in them. We will briefly notice the answer to the eighth point.

It would have been error to have answered that point in the affirmative, for the reason given by the court. It assumed that there was proof of provocation, and that "acting on a mind shattered by dissipation," says the point, and "long-continued indulgence in strong drink, to such an extent as to render the prisoner unable to master himself, and form a cool and deliberate purpose to kill;" then it concluded with a prayer to charge that "the prisoner cannot be convicted of murder in the first degree." "If any doubts," it further adds, "are in the minds of the jury, as to the fact, then their verdict must be for the lighter grade." This was an assumption of a state of the case that did not exist under the proof, and it would have been wrong to have affirmed the point. For this reason we need not discuss the merits of the proposition, but we must say that the doctrine, that if "any doubts" are in the mind of the jury on the point of deliberation, their verdict should be for murder in the second degree, is going a step beyond the rule. If reasonable doubts exist, this would be so. It is not every doubt, however slight, that is to have this effect. Nor was there any proof of provoca-

[Warren *v.* The Commonwealth.]

tion, to operate as stated in the point, and we think the learned judge dealt with it properly in declining to affirm it.

From a careful scrutiny of the whole case, we are constrained to say that we see no error in the record, and that we have no power to interpose to save the prisoner from the legal consequences of his acts.

But we cannot dismiss the case without expressing astonishment at the criminal apathy on the part of a number of persons, men and women, who witnessed the assaults of the prisoner on the deceased, which resulted in death, without an effort to save her. This is as unusual amongst our people as it is unaccountable in this instance. We notice it to condemn it, not through any apprehensions that the example is likely ever to be followed. Our people, with this exception, have too much generosity and courage for this.

Judgment affirmed, and record remitted.