# SWAIN *v.* ALABAMA.

No. 64.  Argued December 8, 1964.—Decided March 8, 1965.

*Constance Baker Motley* argued the cause for petitioner. With her on the brief were *Jack Greenberg, James M. Nabrit III, Orzell Billingsley, Jr., Peter A. Hall* and *Michael Meltsner.*

*Leslie Hall,* Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief was *Richmond M. Flowers,* Attorney General of Alabama.

MR. JUSTICE WHITE delivered the opinion of the Court.

The petitioner, Robert Swain, a Negro, was indicted and convicted of rape in the Circuit Court of Talladega County, Alabama, and sentenced to death. His motions to quash the indictment, to strike the trial jury venire and to declare void the petit jury chosen in the case, all based on alleged invidious discrimination in the selection of jurors, were denied. The Alabama Supreme Court affirmed the conviction, 275 Ala. 508, 156 So. 2d 368, and we granted certiorari, 377 U. S. 915.

In support of his claims, petitioner invokes the constitutional principle announced in 1880 in *Strauder* v. *West Virginia,* 100 U. S. 303, where the Court struck down a state statute qualifying only white people for jury duty. Such a statute was held to contravene the central purposes of the Fourteenth Amendment: "exemption from unfriendly legislation against [Negroes] distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy . . . ." 100 U. S., at 308. Although a Negro defendant is not entitled to a jury containing members of his race, a State's pur-

poseful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause. *Ex parte Virginia,* 100 U. S. 339; *Gibson v. Mississippi,* 162 U. S. 565. This principle was further elaborated in *Carter v. Texas,* 177 U. S. 442, 447, where, in respect to exclusion from grand juries, the Court said:

> "Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied . . . ."

And it has been consistently and repeatedly applied in many cases coming before this Court.[1] The principle of these cases is broadly based.

> "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas,* 311 U. S. 128, 130.

Further, "[j]urymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race." *Cassell v. Texas,* 339 U. S. 282, 286 (opinion of Mr. Justice Reed, announcing judgment). Nor is the

---

[1] *Neal v. Delaware,* 103 U. S. 370; *Norris v. Alabama,* 294 U. S. 587; *Hale v. Kentucky,* 303 U. S. 613; *Pierre v. Louisiana,* 306 U. S. 354; *Smith v. Texas,* 311 U. S. 128; *Hill v. Texas,* 316 U. S. 400; *Akins v. Texas,* 325 U. S. 398; *Patton v. Mississippi,* 332 U. S. 463; *Cassell v. Texas,* 339 U. S. 282; *Avery v. Georgia,* 345 U. S. 559; *Hernandez v. Texas,* 347 U. S. 475; *Reece v. Georgia,* 350 U. S. 85; *Eubanks v. Louisiana,* 356 U. S. 584; *Arnold v. North Carolina,* 376 U. S. 773.

constitutional command forbidding intentional exclusion limited to Negroes. It applies to any identifiable group in the community which may be the subject of prejudice. *Hernandez* v. *Texas,* 347 U. S. 475.

But purposeful discrimination may not be assumed or merely asserted. *Brownfield* v. *South Carolina,* 189 U. S. 426; *Tarrance* v. *Florida,* 188 U. S. 519; *Smith* v. *Mississippi,* 162 U. S. 592; *Bush* v. *Kentucky,* 107 U. S. 110. It must be proven, *Tarrance* v. *Florida, supra; Martin* v. *Texas,* 200 U. S. 316, the quantum of proof necessary being a matter of federal law. *Norris* v. *Alabama,* 294 U. S. 587; *Smith* v. *Texas,* 311 U. S. 128. It is not the soundness of these principles, which is unquestioned, but their scope and application to the issues in this case that concern us here.

I.

We consider first petitioner's claims concerning the selection of grand jurors and the petit jury venire. The evidence was that while Negro males over 21 constitute 26% of all males in the county in this age group, only 10 to 15% of the grand and petit jury panels drawn from the jury box since 1953 have been Negroes, there having been only one case in which the percentage was as high as 23%. In this period of time, Negroes served on 80% of the grand juries selected, the number ranging from one to three. There were four or five Negroes on the grand jury panel of about 33 in this case, out of which two served on the grand jury which indicted petitioner. Although there has been an average of six to seven Negroes on petit jury venires in criminal cases, no Negro has actually served on a petit jury since about 1950. In this case there were eight Negroes on the petit jury venire but none actually served, two being exempt and six being struck by the prosecutor in the process of selecting the jury.

It is wholly obvious that Alabama has not totally excluded a racial group from either grand or petit jury panels, as was the case in *Norris* v. *Alabama*, 294 U. S. 587; *Hill* v. *Texas*, 316 U. S. 400; *Patton* v. *Mississippi*, 332 U. S. 463; *Hernandez* v. *Texas*, 347 U. S. 475; and *Reece* v. *Georgia*, 350 U. S. 85. Moreover, we do not consider an average of six to eight Negroes on these panels as constituting forbidden token inclusion within the meaning of the cases in this Court. *Thomas* v. *Texas*, 212 U. S. 278; *Akins* v. *Texas*, 325 U. S. 398; *Avery* v. *Georgia*, 345 U. S. 559. Nor do we consider the evidence in this case to make out a prima facie case of invidious discrimination under the Fourteenth Amendment.

Alabama law requires that the three jury commissioners in Talladega County place on the jury roll all male citizens in the community over 21 who are reputed to be honest, intelligent men and are esteemed for their integrity, good character and sound judgment. Ala. Code, Tit. 30, §§ 20, 21 (1958).[2] In practice, however, the

---

[2] There is a special statute governing jury selection in Talladega County. Ala. Acts, 1955 Sess., Act No. 475, vol. 2, at 1081. The provisions pertinent to this case follow the general state statute and thus all references will be to the latter.

Ala. Code, Tit. 30, § 21 (1958) provides:

"Qualifications of persons on jury roll.—The jury commission shall place on the jury roll and in the jury box the names of all male citizens of the county who are generally reputed to be honest and intelligent men and are esteemed in the community for their integrity, good character and sound judgment; but no person must be selected who is under twenty-one or who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or cannot read English or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder his name may be placed on the jury roll and in the jury box. No person over the age of sixty-five years shall be required to serve on a jury or to remain on the panel of jurors unless he is willing to do so."

commissioners do not place on the roll all such citizens, either white or colored.[3]  A typical jury roll at best contains about 2,500 names, out of a total male population over 21, according to the latest census, of 16,406 persons. Each commissioner, with the clerk's assistance, produces for the jury list names of persons who in his judgment are qualified.  The sources are city directories, registration lists, club and church lists, conversations with other persons in the community, both white and colored, and personal and business acquaintances.[4]

---

[3] Although the statute aims at an exhaustive jury list, failure to include the name of every qualified person on the jury roll is not a ground to quash an indictment or venire, absent fraud or purposeful discrimination.  *Fikes* v. *Alabama,* 263 Ala. 89, 81 So. 2d 303 (1955), rev'd on other grounds, 352 U. S. 191.

[4] The commissioners testified that since 1959 they have met once or twice yearly, for about an hour each meeting, at which time each commissioner presented a list of persons he deemed qualified for jury service.  Their names were obtained from disparate sources, each commissioner going about his task in his area of the county in his own way.  The chief commissioner testified that with the assistance of city directories, and registration lists, he went out into the beats to which he was assigned and asked persons he knew for suggestions and information.  He also secured names from customers of his paint store.  He averred that he was familiar with Negro and white members of the community, talked with both, and used the same method for determining the qualifications of both Negro and white citizens. Another commissioner, working a predominantly rural area, testified that membership lists of Farm Bureau Cooperatives in the area and the Rural Electric Cooperative were his main sources of names, both organizations having a substantial number of Negro and white persons.  He also relied on the city directory for Talladega City and on the people he knew through his 40 years of residence and farming in the area.  He noted that he did not rely on predominantly white social clubs or on Negro churches, adding that he was not familiar with the relative percentage of Negroes or whites in his beats and could not identify the persons on the jury list by race. He also stated that the jury list did not contain the names of all qualified citizens and that compilation of an all-inclusive list would be impossible.  The third commissioner testified that he used the tele-

Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. *Virginia* v. *Rives,* 100 U. S. 313, 322–323; *Gibson* v. *Mississippi,* 162 U. S. 565; *Thomas* v. *Texas,* 212 U. S. 278, 282; *Cassell* v. *Texas,* 339 U. S. 282. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. "Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible." *Cassell* v. *Texas,* 339 U. S. 282, 286–287 (opinion of Mr. Justice Reed, announcing judgment). We cannot say that purposeful discrimination based on race alone is satisfactorily

---

phone directory and went out into the various beats to gather names through local merchants and citizens, both Negro and white. He also relied on the customers of his business. He too was unable to identify the persons on the jury list by race. The clerk stated that she assisted by supplying some additional names to the commissioners; she compiled these names from various directories, church rolls, club rolls and from lists sent by the managers of local plants and industries. She testified that she was acquainted with more white persons than Negroes but that she did not visit the beats or talk with persons in the beats to gather names for the commission's approval. All the commissioners averred that they did not watch the color line in obtaining names, did not know the number of Negroes in their beats, and, accordingly, did not count the number of whites and colored people in preparing the lists. The record contains no admission by the commissioners that they had relatively few Negro acquaintances or that they tended primarily to use white church lists or white club lists.

proved by showing that an identifiable group in a community is underrepresented by as much as 10%. See *Thomas* v. *Texas,* 212 U. S. 278, 283; *Akins* v. *Texas,* 325 U. S. 398; *Cassell* v. *Texas,* 339 U. S. 282. Here the commissioners denied that racial considerations entered into their selections of either their contacts in the community or the names of prospective jurors. There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community. Nor was there any meaningful attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the commissioners. It is not clear from the record that the commissioners even knew how many Negroes were in their respective areas, or on the jury roll or on the venires drawn from the jury box. The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes. Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race.[5] We do not think that the burden of proof was carried by petitioner in this case.

## II.

Petitioner makes a further claim relating to the exercise of peremptory challenges to exclude Negroes from serving on petit juries.

---

[5] " 'It may be that the jury commissioners did not give the negro race a full *pro rata* with the white race in the selection of the grand and petit jurors in this case, still this would not be evidence of discrimination. If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated.' " *Thomas* v. *Texas,* 212 U. S. 278, 283.

In Talladega County the petit jury venire drawn in a criminal case numbers about 35 unless a capital offense is involved, in which case it numbers about 100. Ala. Code, Tit. 30, §§ 60, 62, 63 (1958). After excuses and removals for cause, the venire in a capital case is reduced to about 75. The jury is then "struck"—the defense striking two veniremen and the prosecution one in alternating turns, until only 12 jurors remain. Ala. Code, Tit. 30, § 64 (1958). This essentially is the Alabama struck-jury system, applicable in all criminal cases and available in civil cases. Ala. Code, Tit. 30, §§ 54, 60 (1958). In this case, the six Negroes available for jury service were struck by the prosecutor in the process of selecting the jury which was to try petitioner.

In the trial court after the jury was selected, petitioner moved to have the jury declared void on Fourteenth Amendment grounds. Among other things the motion alleged:

> "(4) That because of the systematic and arbitrary method of selecting the names of qualified male citizens, negro male citizens, by the Jury Commission of Talladega County, Alabama, the State can, and did in this case, readily strike members of the negro race and that there were only six negroes remaining on the final venire in this cause, in violation of the Fourteenth Amendment of the Constitution of the United States and also the Constitution of the State of Alabama . . . ."

The main thrust of the motion according to its terms was the striking of the six Negroes from the petit jury venire.[6] No evidence was taken, petitioner apparently

---

[6] The issue in regard to striking Negroes was raised in a different form in the motion to quash the venire. It read in pertinent part:

"4. Defendant avers the existence of a system or practice in the drawing or organization of juries to serve in Talladega County, Alabama, deliberately designed to discriminate against members of the Negro race in order to prevent them from serving on juries by either

being content to rely on the record which had been made in connection with the motion to quash the indictment. We think the motion, seeking as it did to invalidate the alleged purposeful striking of Negroes from the jury which was to try petitioner, was properly denied.

In providing for jury trial in criminal cases, Alabama adheres to the common-law system of trial by an impartial jury of 12 men who must unanimously agree on a verdict,[7] the system followed in the federal courts by virtue of the Sixth Amendment. As part of this system it provides for challenges for cause and substitutes a system of strikes for the common-law method of peremptory challenge.[8] Alabama contends that its system of pe-

---

excluding them from the venire altogether or by keeping the number included so small that they can be systematically and uniformly struck from the venire and prevented from serving in the trial of any case."

This claim was repeated in the motion to declare void the petit jury selected.

"(3) That because of the systematic and arbitrary method of selecting the names of qualified male citizens by the jury commission of Talladega County, Alabama, it is impossible for qualified members of the negro race to serve as jurors in this cause or any cause . . . ."

The above claim as well as the objection to the prosecutor's exercise of his strikes against the six Negroes in this case was repeated in the motion for a new trial. No further claims were made and no further evidence was taken on any of these motions.

[7] In all prosecutions by indictment the accused has a right to a speedy public trial by an impartial jury in the county in which the offense was committed. Ala. Const. of 1901, § 6. See also Ala. Const. of 1901, §§ 11, 12; Collins v. State, 88 Ala. 212, 7 So. 260 (1890).

[8] Alabama had long provided both the defendant and prosecutor with a substantial number of peremptory challenges. Under the 1867 Code, the defendant was entitled to 21 peremptories in capital cases and 15 in noncapital felony cases; correspondingly the State had 14 peremptories in capital trials and 10 in other felony trials. 1867 Ala. Rev. Code §§ 4178, 4179. These numbers were altered in the 1907 Act, the defendant having eight peremptories in a noncapital felony case and the State four. The numbers in capital cases remained

remptory strikes—challenges without cause, without explanation and without judicial scrutiny—affords a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial. This system, it is said, in and of itself, provides justification for striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes. Based on the history of this system and its actual use and operation in this country, we think there is merit in this position.

The peremptory challenge has very old credentials. In all trials for felonies at common law, the defendant was allowed to challenge peremptorily 35 jurors,[9] and the

---

the same. 1907 Ala. Code § 7275. The struck-jury system was introduced in 1909 as a part of a comprehensive amendment of the statutes governing the selection and impaneling of juries in the State. 1909 Leg. Acts, Spec. Sess., p. 319. The history and purposes of this legislation, as set out by the sponsor of the Act, may be found in John, The Jury Law, 1910–1911 Alabama Bar Assn. Rep. 198:

"The provision for struck juries in criminal cases, is found to be much fairer to the Solicitor and the Attorneys for defendants, and under it a jury can be more easily and quickly obtained, and it would be a decided step backward to restore the challenge system, with its delay and chances for errors." *Id.*, at 205.

[9] It was thought that peremptory challenges were allowed at common law in capital felonies only. Thus Blackstone states: "[I]n criminal cases, or at least in capital ones, there is, *in favorem vitae*, allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all; which is called a *peremptory* challenge: a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous." 4 Blackstone Commentaries 353 (15th ed. 1809) (hereafter Bl. Comm.).

This statement was not far amiss, since most felonies were generally punishable by death. 4 Bl. Comm. 98. But peremptories were allowable in trials of felonies that were not capital. *Gray* v. *Reg.*, 11 Cl. & Fin. 427 (H. L. 1844). See I Thompson, Trials § 42 (2d ed. 1912) (hereafter Thompson); I Stephen, History of Criminal Law of England 302 (1883) (hereafter Stephen).

prosecutor originally had a right to challenge any number of jurors without cause, a right which was said to tend to "infinite delayes and danger." Coke on Littleton 156 (14th ed. 1791).[10] Thus The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), provided that if "they that sue for the King will challenge any . . . Jurors, they shall assign . . . a Cause certain." So persistent was the view that a proper jury trial required peremptories on both sides, however, that the statute was construed to allow the prosecution to direct any juror after examination to "stand aside" until the entire panel was gone over and the defendant had exercised his challenges; only if there was a deficiency of jurors in the box at that point did the Crown have to show cause in respect to jurors recalled to make up the required number.[11] Peremptories on both sides became the settled law of England, continuing in the above form until after the separation of the Colonies.[12]

---

[10] The defendant's right remained unaltered until 22 Hen. 8, c. 14, § 6 (1530); 25 Hen. 8, c. 3 (1533), when the number was limited to 20 in all cases except high treason. See generally Proffatt, Trial By Jury § 156 (1877) (hereafter Proffatt).

[11] *Lord Grey's Case,* 9 How. St. Tr. 128 (1682); *Reg.* v. *Frost,* 9 Car. & P. 129 (1839); *Mansell* v. *Reg.,* 8 El. & Bl. 54 (1857); 4 Bl. Comm. 353. The number of jurors called was in the discretion of the court and it is reported that the right to stand aside was exercised liberally. Proffatt § 160. All attempts to limit or abolish the Crown's right were rejected. *Reg.* v. *Frost, supra; O'Coigly's Case,* 26 How. St. Tr. 1191, 1231; I Thompson § 49; Busch, Law and Tactics in Jury Trials § 69 (1949) (hereafter Busch).

[12] It remains the law of England today, except the number the defendant may now exercise is seven. See 6 Geo. 4, c. 50, § 29 (1825); 11 & 12 Geo. 6, c. 58, § 35 (Criminal Justice Act of 1948). The actual use of challenges by either side has been rare, for at least a century, but the continued availability of the right is considered important. I Stephen 303; Devlin, Trial By Jury 29–37 (1956) (hereafter Devlin); Howard, Criminal Justice In England 362–364 (1931) (hereafter Howard).

This common law provided the starting point for peremptories in this country. In the federal system, Congress early took a part of the subject in hand in establishing that the defendant was entitled to 35 peremptories in trials for treason and 20 in trials for other felonies specified in the 1790 Act as punishable by death, 1 Stat. 119 (1790). In regard to trials for other offenses without the 1790 statute, both the defendant and the Government were thought to have a right of peremptory challenge, although the source of this right was not wholly clear.[13] In 1865, the Government was given by statute five peremptory challenges in capital and treason cases, the defendant being entitled to 20, and two in other cases where the right of the defendant to challenge then existed,

---

[13] *United States* v. *Johns*, 4 Dall. 412, 414 (Cir. Ct. Pa. 1806). Mr. Justice Washington, sitting on circuit, stated:

"The right of challenge was a privilege highly esteemed, and anxiously guarded, at the common law; and it cannot be doubted, but that at the common law, a prisoner is entitled, on a capital charge, to challenge peremptorily, thirty-five jurors. If, therefore, the act of congress has substituted no other rule . . . the common law rule must be pursued." See also *United States* v. *Wilson & Porter*, 1 Bald. 78, 82 (Cir. Ct. Pa. 1830); *United States* v. *Douglass*, Fed. Cas. No. 14989, 2 Blatch. C. C. 207 (Cir. Ct. S. D. N. Y. 1851). But see *United States* v. *Cottingham*, Fed. Cas. No. 14872, 2 Blatch. C. C. 470 (Cir. Ct. N. D. N. Y. 1852).

In *United States* v. *Marchant*, 12 Wheat. 480, this Court indicated that the Crown's power to stand aside was a part of the common law inherited from the English. Federal courts allowed the Government to stand aside on the basis of this decision. *United States* v. *Wilson & Porter, supra; United States* v. *Douglass, supra.* In 1856, the Court held in *United States* v. *Shackleford*, 18 How. 588, that federal statutes affording the defendant a right of challenge did not incorporate the Government's right to stand aside. The Government could do this only by virtue of the 1840 Act, 5 Stat. 394, empowering the federal courts to adopt the state practice in regard to selection and impaneling of juries.

he being entitled to 10. 13 Stat. 500 (1865).[14] Subsequent enactments increased the number of challenges the Government could exercise, the Government now having an equal number with the defendant in capital cases, and six in cases where the crime is punishable by more than one year's imprisonment, the defendant or defendants having ten.[15]

The course in the States apparently paralleled that in the federal system. The defendant's right of challenge was early conferred by statute, the number often corresponding to the English practice,[16] the prosecution was

[14] A few years later Congress extended the defendant's right to 10 challenges in all noncapital felony cases and the Government was entitled to three in such cases; it also extended the right to misdemeanors and civil cases, each party being entitled to three. 17 Stat. 282 (1872).

[15] See 36 Stat. 1166, § 287 (1911) providing that where the offense is a capital offense or treason, the defendant is entitled to 20 peremptory challenges and the United States to six; in all other felony trials, the defendant has 10, the United States six.

Rule 24 (b) of the Federal Rules of Criminal Procedure provides:

"(b) Peremptory Challenges. If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."

The Government's right to stand aside was deemed to survive early statutes giving the Government peremptory challenges. *Sawyer* v. *United States*, 202 U. S. 150.

[16] See *Waterford & Whitehall Turnpike Co.* v. *People*, 9 Barb. 161 (Sup. Ct. N. Y. 1850); *People* v. *McQuade*, 110 N. Y. 284, 293, 18 N. E. 156, 158 (1888); *State* v. *Humphreys*, 1 Tenn. 306 (1808); *Brown* v. *State*, 62 N. J. L. 666, 678–688, 42 A. 811, 814–818 (1899), aff'd, 175 U. S. 172; *Hendrick* v. *Commonwealth*, 5 Leigh 707, 715

thought to have retained the Crown's common-law right to stand aside,[17] and by 1870, most, if not all, States had enacted statutes conferring on the prosecution a substantial number of peremptory challenges, the number generally being at least half, but often equal to, the number had by the defendant.[18] Although there has been some criticism in the twentieth century leveled at peremptory challenges, on the basis of the delays, expense and elimination of qualified jurors incident to their use,[19] the sys-

(Va. Gen. Ct. 1834); *Robinson v. State,* 1 Ga. 563, 571 (1846); *State v. Arthur,* 13 N. C. 217 (1829); *State v. Benton,* 19 N. C. 196 (1836). But cf. *State v. George,* 1 Del. Cas. 161 (Ct. Q. Sess. 1797). See also II Bishop, Criminal Procedure § 941 (1913) (hereafter Bishop); I Thompson § 42.

[17] *Waterford & Whitehall Turnpike Co., supra; Commonwealth v. Eisenhower,* 181 Pa. 470, 37 A. 521 (1897); *Jewell v. Commonwealth,* 22 Pa. 94 (1853); *State v. Arthur,* 13 N. C. 217 (1829); Proffatt § 162; I Thompson § 49; II Bishop §§ 938, 939.

[18] *E. g.,* 1873 N. Y. Laws, c. 427; 1874 Ill. Rev. Stat., p. 411; *Maton v. People,* 15 Ill. 536 (1854); *Brown v. State,* 62 N. J. L. 666, 684–685, 42 A. 811, 817 (1899), aff'd, 175 U. S. 172; 1869 Mass. Acts, c. 151; 1860 Pa. Laws 427, Act No. 375, §§ 36, 37; *Warren v. Commonwealth,* 37 Pa. 45 (1860); *State v. Briggs,* 27 S. C. 80, 2 S. E. 854 (1887); *Boon v. State,* 1 Ga. 618 (1846); Cal. Laws 1850–1853, c. 121, § 343; 1863–1864 Cal. Stats., c. 348, p. 394, § 1; Proffatt § 161. The State's right to stand aside was deemed to survive these statutes, *Warren v. Commonwealth,* 37 Pa. 45 (1860); *Haines v. Commonwealth,* 100 Pa. 317, 322 (1882); *State v. McNinch,* 12 S. C. 89 (1879); *State v. Benton,* 19 N. C. 196, 203 (1836); I Thompson § 49, although opinion was divided, *Sealy v. State,* 1 Ga. 213 (1846); *Mathis v. State,* 31 Fla. 291, 315, 12 So. 681, 688 (1893). In many States this right has been expressly barred by statute. *E. g.,* N. C. Gen. Stat. §§ 15–163, 15–164 (1953); Pa. Stat. Ann., Tit. 19, § 811 (1964); S. C. Code § 38–211 (1962).

[19] The charges leveled at peremptory challenges have been that they required summoning a large number of veniremen, that they were used by defendants to eliminate intelligent and highly qualified jurors, that the imbalance in number in favor of defendants was unfair, that the *voir dire* as a predicate for their exercise was too extensive and that they generally protracted the selection process. See Proposed

tem has survived these attacks. In every State, except where peremptory strikes are a substitute, peremptory challenges are given by statute to both sides in both criminal and civil cases, the number in criminal cases still being considerably greater. Under these statutes the prosecution generally possesses a substantial number of challenges.[20]

The system of struck juries also has its roots in ancient common-law heritage.[21] Since striking a jury allowed

Legislation For Jury Reform in New York, 30 Col. L. Rev. 721, 726 (1930); Missouri Crime Survey 356–357 (1926); Evans, Recommendations For Reforms In Criminal Procedure, 24 Ill. L. Rev. 112, 113–114 (1929); Challenges and the Powers of Judges, 23 Green Bag 84 (1911); 3 Proc. Am. Law Inst. 501 (1925); Report of Illinois Judicial Advisory Council 17–18 (1931); Extracts from Rep. of Comm. to Third Ann. Meeting of A. L. I., Defects in Criminal Justice, 11 A. B. A. J. 297, 298 (1925); Smith, Criminal Justice in America: A Reply, 11 A. B. A. J. 797–798 (1925).

[20] Classification of offenses and punishment on which the number exercisable depends varies among the States, as does the number of challenges within these categories, and hence meaningful generalization in regard to current statutes is not feasible. For an example of these variations, see Ariz. Rev. Stat., Rules Crim. Proc. 225 (1956); Conn. Gen. Stat. § 51–242 (1958); Del. Code Ann., Super. Ct. Rules Crim. Proc. 24 (b) (1953); Cal. Penal Code § 1070 (1956); Fla. Stat. § 913.08 (1963); Ga. Code Ann. § 59–805 (1937); Ill. Ann. Stat., c. 38, § 115–4 (e) (1964); Mass. Gen. Laws Ann., c. 234, § 29 (1959); Md. Ann. Code, Rules Proc. 746 (1963); Mo. Ann. Stat. § 546.180 (1953); N. J. Stat. Ann. 2A:78–7 c and d (1952); N. Y. Crim. Code and Penal Law §§ 370, 373 (1964); N. C. Gen. Stat. §§ 15–163, 15–164 (1953); Ohio Rev. Code Ann., Tit. 29, §§ 2945.21, 2945.22 (1954); Pa. Stat. Ann., Tit. 19, § 811 (1964); S. C. Code § 38–211 (1962); Tenn. Code Ann. § 40–2510 (1955); Tex. Code Crim. Proc., Tit. 8, Arts. 615, 634 (1941); Utah Code Ann. § 77–30–15 (1953).

For a listing of the state statutes in effect in 1930 and the variations in number and classifications among the States, see A. L. I. Code of Criminal Procedure, Commentary to § 282, at 855–862 (1930).

[21] Historically 48 names would be selected from a special jury list and each side would alternately strike 12 names, the remaining 24

both sides a greater number of challenges and an opportunity to become familiar with the entire venire list, it was deemed an effective means of obtaining more impartial and better qualified jurors. Accordingly, it was used in causes of "great nicety" or "where the sheriff [responsible for the jury list] was suspected of partiality." 3 Bl. Comm. 357. It is available in many States for both civil and criminal cases.[22] The Alabama system adheres to the common-law form, except that the veniremen are drawn from the regular jury list, are summoned to court before striking begins and the striking continues until 12 rather than 24 remain. It was adopted as a fairer system to the defendant and prosecutor and a more efficacious, quicker way to obtain an impartial jury satisfactory to the parties.[23]

In contrast to the course in England, where both peremptory challenge and challenge for cause have fallen into disuse, peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society.[24] The *voir dire* in American trials tends to be

---

being summoned for the case. *Brown* v. *State,* 62 N. J. L. 666, 688–690, 42 A. 811, 818 (1899), aff'd, 175 U. S. 172; 3 Bl. Comm. 357; Forsyth, History of Trial by Jury 173. Use of the struck jury system was not confined to criminal cases at common law, as the peremptory challenge was. Busch § 62; Proffatt § 72.

[22] See N. J. Stat. Ann. 2A:75–1, 2A:75–2, 2A:75–3; Md. Ann. Code, Rules Proc. 543 (1963); Busch § 62; 31 Am. Jur. § 90. Cf. 28 U. S. C. § 1866 (1958 ed.).

[23] John, The Jury Law, 1910–1911 Alabama Bar Assn. Rep. 198, 205.

[24] Devlin, *supra,* at 20–36. Another reason suggested for the difference lies in the greater control in England over pretrial publicity. "[O]ne of the salient reasons why both court and counsel have confidence in the impartiality and integrity of trial jurors is the authority the courts exercise in preventing the newspapers from prejudging a pending case." Howard 363 (1931).

extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted.[25] The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury. See *Lewis* v. *United States,* 146 U. S. 370, 376. Although "[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges," *Stilson* v. *United States,* 250 U. S. 583, 586, nonetheless the challenge is "one of the most important of the rights secured to the accused," *Pointer* v. *United States,* 151 U. S. 396, 408. The denial or impairment of the right is reversible error without a showing of prejudice, *Lewis* v. *United States, supra; Harrison* v. *United States,* 163 U. S. 140; cf. *Gulf, Colorado & Santa Fe R. Co.* v. *Shane,* 157 U. S. 348. "For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis* v. *United States, supra,* at 378.

The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that "to perform its high function in the best way 'justice must satisfy the appearance of justice.' " *In re Murchison,* 349 U. S. 133, 136. Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility

---

[25] See Devlin, *supra,* at 32–34; Busch §§ 145–154; Bodin, Selecting a Jury 44–72 (PLI 1954) (hereafter Bodin).

through examination and challenge for cause. Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee "not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held." *Hayes* v. *Missouri,* 120 U. S. 68, 70.

The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. *State* v. *Thompson,* 68 Ariz. 386, 206 P. 2d 1037 (1949); *Lewis* v. *United States,* 146 U. S. 370, 378. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. *Hayes* v. *Missouri,* 120 U. S. 68, 70. It is often exercised upon the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," *Lewis, supra,* at 376, upon a juror's "habits and associations," *Hayes* v. *Missouri, supra,* at 70, or upon the feeling that "the bare questioning [a juror's] indifference may sometimes provoke a resentment," *Lewis, supra,* at 376. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty.[26] For the question a prosecutor or defense

---

[26] See, *e. g., Aldridge* v. *United States,* 283 U. S. 308; *Hall* v. *United States,* 83 U. S. App. D. C. 166, 168 F. 2d 161, cert. denied, 334 U. S. 853; *State* v. *Higgs,* 143 Conn. 138, 120 A. 2d 152 (1956); *Gurley* v. *State,* 164 Ark. 397, 262 S. W. 636 (1924); *People* v. *Car Soy,* 57 Cal. 102 (1880); *People* v. *Reyes,* 5 Cal. 347 (1855); *Fendrick* v. *State,* 39 Tex. Cr. R. 147, 45 S. W. 589 (1898); *State* v. *Carson,* 131 S. C. 42,

counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be.[27] It is well known that these factors are widely explored during the *voir dire,* by both prosecutor and accused, *Miles* v. *United States,* 103 U. S. 304; *Aldridge* v. *United States,* 283 U. S. 308.[28] This Court has held that the fairness of trial by jury requires no less. *Aldridge, supra.*[29] Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change

126 S. E. 757 (1925); *Wasy* v. *State,* 234 Ind. 52, 123 N. E. 2d 462 (1955); *People* v. *Roxborough,* 307 Mich. 575, 12 N. W. 2d 466 (1943), cert. denied, 323 U. S. 749. See generally Busch § 146; 54 A. L. R. 2d 1204; Bodin 61–67.

[27] This is especially so under the Alabama strike system, where all the veniremen are known to the parties before striking begins.

[28] See cases cited in n. 26, *supra.*

[29] Race or religion and beliefs stemming therefrom have at times constituted grounds of challenge for cause. *State* v. *Sanders,* 103 S. C. 216, 88 S. E. 10 (1916); *Potter* v. *State,* 86 Tex. Cr. R. 380, 216 S. W. 886 (1919); *McFadden* v. *Commonwealth,* 23 Pa. 12 (1853). But cf. *Johnson* v. *State,* 88 Neb. 565, 130 N. W. 282 (1911); *State* v. *Giudice,* 170 Iowa 731, 153 N. W. 336 (1915); *Commonwealth* v. *DePalma,* 268 Pa. 25, 110 A. 756 (1920); *Romero* v. *State,* 107 Tex. Cr. R. 70, 294 S. W. 857 (1927). See generally 54 A. L. R. 2d 1204.

in the nature and operation of the challenge. The challenge, *pro tanto,* would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case.

## III.

Petitioner, however, presses a broader claim in this Court.[30] His argument is that not only were the Negroes

---

[30] This claim was not set forth in the motion to quash the venire or the motion to declare void the petit jury selected, the only motions in which the Alabama strike system was challenged in the trial court. However, the decision of the Alabama Supreme Court may be read to have ruled on the challenge to the exercise of strikes against Negroes in its broadest form.

"As to the contention that Negroes are systematically excluded from trial juries, the evidence discloses that Negroes are commonly on trial

removed by the prosecutor in this case but that there never has been a Negro on a petit jury in either a civil or criminal case in Talladega County and that in criminal cases prosecutors have consistently and systematically exercised their strikes to prevent any and all Negroes on petit jury venires from serving on the petit jury itself. This systematic practice, it is claimed, is invidious discrimination for which the peremptory system is insufficient justification.

We agree that this claim raises a different issue and it may well require a different answer. We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged. But when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356. In these circumstances, giving even the

venires but are always struck by attorneys in selecting the trial jury. It has long been held that, where allowed by statute, peremptory challenges may be used without any assigned or stated cause. Both the federal and Alabama jurisdictions have statutes providing for peremptory challenges. The fact that the prosecution peremptorily strikes every Negro from the jury panel in a case where the defendant is a Negro does not constitute a violation of the defendant's constitutional rights . . . ." 275 Ala. 508, 515, 156 So. 2d 368, 375 (citations omitted). Cf. *Saltonstall* v. *Saltonstall,* 276 U. S. 260, 267–268; *Charleston Federal Savings & Loan Assn.* v. *Alderson,* 324 U. S. 182, 185–186.

widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify.

We need pursue this matter no further, however, for even if a State's systematic striking of Negroes in the selection of petit juries raises a prima facie case under the Fourteenth Amendment, we think it is readily apparent that the record in this case is not sufficient to demonstrate that the rule has been violated by the peremptory system as it operates in Talladega County. Cf. *Glasser* v. *United States,* 315 U. S. 60, 87.

The difficulty with the record before us, perhaps flowing from the fact that it was made in connection with the motion to quash the indictment, is that it does not with any acceptable degree of clarity, show when, how often, and under what circumstances the prosecutor alone has been responsible for striking those Negroes who have appeared on petit jury panels in Talladega County. The record is absolutely silent as to those instances in which the prosecution participated in striking Negroes, except for the indication that the prosecutor struck the Negroes in this case and except for those occasions when the defendant himself indicated that he did not want Negroes on the jury. Apparently in some cases, the prosecution

agreed with the defense to remove Negroes. There is no evidence, however, of what the prosecution did or did not do on its own account in any cases other than the one at bar.[31] In one instance the prosecution offered the defendant an all-Negro jury but the defendant in that case did not want a jury with any Negro members. There was other testimony that in many cases the Negro defendant preferred an all-white to a mixed jury. One lawyer, who had represented both white and Negro defendants in criminal cases, could recall no Negro client who wanted Negroes on the jury which was to try him. The prosecutor himself, who had served since 1953, said that if the Negro defendant wanted Negroes on the jury it would depend "upon the circumstances and the conditions and the case and what I thought justice demanded and what [it] was in that particular case," and that striking is done differently depending on the race of the defendant and the victim of the crime. These statements

---

[31] The prosecutor testified that on occasion he would ask defense counsel if he wanted Negroes on the jury; if the defense did not, and the prosecutor agreed, "what we do then is just to take them off. Strike them first." The record makes clear that this was not a general practice and the matter was not explored further:

"Q. Let me ask you this. You stated that the defendants generally do not want a negro to serve on a jury that is sworn to try him?

"A. I didn't say that. I didn't—they generally didn't want it. I said in the past there has been occasion here where that has happened.

"Q. Have there been any cases where they did want negroes to serve on juries in their behalf?

"A. I wouldn't know if there has been. Not to my knowledge, because I am not representing defendants. I am representing the State. Do you see what I mean?

"Q. Yes.

"A. In other words, that would be between attorney and client, privileged, and I wouldn't know what they wanted. You would have to ask these defense attorneys about that."

do not support an inference that the prosecutor was bent on striking Negroes, regardless of trial-related considerations. The fact remains, of course, that there has not been a Negro on a jury in Talladega County since about 1950. But the responsibility of the prosecutor is not illuminated in this record. There is no allegation or explanation, and hence no opportunity for the State to rebut, as to when, why and under what circumstances in cases previous to this one the prosecutor used his strikes to remove Negroes. In short, petitioner has not laid the proper predicate for attacking the peremptory strikes as they were used in this case. Petitioner has the burden of proof and he has failed to carry it.

A dissent asserts that a showing that there are qualified Negroes and that none have served makes out a prima facie case of purposeful discrimination on the part of the State and that the continued vitality of *Strauder* v. *West Virginia,* 100 U. S. 303, as well as "a practical accommodation" between the constitutional right of equal protection and the statutory right of peremptory challenge, requires application of such a rule here. Where discrimination is said to occur in the selection of veniremen by state jury commissioners, "proof that Negroes constituted a substantial segment of the population . . . , that some Negroes were qualified to serve as jurors, and that none *had been called* for jury service over an extended period of time . . . constitute[s] prima facie proof of the systematic exclusion of Negroes from jury service," *Hernandez* v. *Texas,* 347 U. S. 475, 480, as does proof "that no Negro had served on a criminal court *grand or petit jury* for a period of thirty years," *Patton* v. *Mississippi,* 332 U. S. 463, 466. (Emphasis added.) See also *Norris* v. *Alabama,* 294 U. S. 587; *Harper* v. *Mississippi,* 251 Miss. 699, 171 So. 2d 129 (1965). Total exclusion of Negroes by the state officers

responsible for selecting names of jurors gives rise to a fair inference of discrimination on their part, an inference which is determinative absent sufficient rebuttal evidence. But this rule of proof cannot be woodenly applied to cases where the discrimination is said to occur during the process of peremptory challenge of persons called for jury service. Unlike the selection process, which is wholly in the hands of state officers, defense counsel participate in the peremptory challenge system, and indeed generally have a far greater role than any officers of the State. It is for this reason that a showing that Negroes have not served during a specified period of time does not, absent a sufficient showing of the prosecutor's participation, give rise to the inference of systematic discrimination on the part of the State. The ordinary exercise of challenges by defense counsel does not, of course, imply purposeful discrimination by state officials. This is not to say that a defendant attacking the prosecutor's use of peremptory challenges over a period of time need elicit an admission from the prosecutor that discrimination accounted for his rejection of Negroes, any more than a defendant attacking jury selection need obtain such an admission from the jury commissioners. But the defendant must, to pose the issue, show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time. This is the teaching of *Hernandez* v. *Texas,* 347 U. S. 475; *Norris* v. *Alabama,* 294 U. S. 587; *Patton* v. *Mississippi,* 332 U. S. 463. We see no reason, except for blind application of a proof standard developed in a context where there is no question of state responsibility for the alleged exclusion, why the defendant attacking the prosecutor's systematic use of challenges against Negroes should not be required to establish on the record the prosecutor's conduct in this regard, especially where the same prosecutor

for many years is said to be responsible for this practice and is quite available for questioning on this matter.[32] Accordingly the judgment is

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

In joining the opinion of the Court, I deem it appropriate to emphasize my understanding that the Court reserves, and does not decide, the question which in Part III of its opinion it finds not presented by the record in this case.

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, dissenting.

In 1880 this Court, in *Strauder* v. *West Virginia,* 100 U. S. 303, one of the first cases applying the Fourteenth Amendment to racial discrimination, held that under the Equal Protection Clause, a State cannot systematically exclude persons from juries solely because of their race or color. Since *Strauder* and until today this Court has consistently applied this constitutional principle. See *Ex parte Virginia,* 100 U. S. 339; *Neal* v. *Delaware,* 103 U. S. 370; *Gibson* v. *Mississippi,* 162 U. S. 565; *Carter* v. *Texas,* 177 U. S. 442; *Rogers* v. *Alabama,* 192 U. S. 226; *Martin* v. *Texas,* 200 U. S. 316; *Norris* v. *Alabama,* 294 U. S. 587;

---

[32] We also reject the assertion that the method of selecting veniremen in Talladega County, with its lower proportion of Negroes on the venire list, when considered with the system of peremptory strikes establishes a prima facie case of discrimination. Absent a showing of purposeful exclusion of Negroes in the selection of veniremen, which has not been made, the lower proportion of Negroes on the venire list sheds no light whatsoever on the validity of the peremptory strike system or on whether the prosecutor systematically strikes Negroes in the county. Moreover, the constitutional issue in regard to the prosecutor's systematic use of strikes against Negroes remains much the same whatever the number of Negroes on the venire list.

*Hale* v. *Kentucky,* 303 U. S. 613; *Pierre* v. *Louisiana,* 306 U. S. 354; *Smith* v. *Texas,* 311 U. S. 128; *Hill* v. *Texas,* 316 U. S. 400; *Akins* v. *Texas,* 325 U. S. 398; *Patton* v. *Mississippi,* 332 U. S. 463; *Cassell* v. *Texas,* 339 U. S. 282; *Hernandez* v. *Texas,* 347 U. S. 475; *Reece* v. *Georgia,* 350 U. S. 85; *Eubanks* v. *Louisiana,* 356 U. S. 584; *Arnold* v. *North Carolina,* 376 U. S. 773.

The rationale upon which these decisions rest was clearly stated in *Norris* v. *Alabama, supra,* at 589:

"There is no controversy as to the constitutional principle involved. . . . Summing up precisely the effect of earlier decisions, this Court thus stated the principle in *Carter* v. *Texas,* 177 U. S. 442, 447, in relation to exclusion from service on grand juries: 'Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. *Strauder* v. *West Virginia,* 100 U. S. 303; *Neal* v. *Delaware,* 103 U. S. 370, 397; *Gibson* v. *Mississippi,* 162 U. S. 565.' This statement was repeated in the same terms in *Rogers* v. *Alabama,* 192 U. S. 226, 231, and again in *Martin* v. *Texas,* 200 U. S. 316, 319. The principle is equally applicable to a similar exclusion of negroes from service on petit juries. *Strauder* v. *West Virginia, supra; Martin* v. *Texas, supra.* And although the state statute defining the qualifications of jurors may be fair on its face, the constitutional provision affords protection against action of the State through its administrative officers in effecting the prohibited

discrimination. *Neal* v. *Delaware, supra; Carter* v. *Texas, supra.* Compare *Virginia* v. *Rives,* 100 U. S. 313, 322, 323; *In re Wood,* 140 U. S. 278, 285; *Thomas* v. *Texas,* 212 U. S. 278, 282, 283."

This set of principles was recently and explicitly re-affirmed by this Court in *Eubanks* v. *Louisiana, supra,* and *Arnold* v. *North Carolina, supra.*

The reasons underlying the Court's decisions in these cases were well expressed in *Strauder:*

"The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds. Blackstone, in his Commentaries, says, 'The right of trial by jury, or the country, is a trial by the peers of every Englishman, and is the grand bulwark of his liberties, and is secured to him by the Great Charter.' It is also guarded by statutory enactments intended to make impossible what Mr. Bentham called 'packing juries.' It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy." 100 U. S., at 308–309.

Moreover,

"[t]he very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race

prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." 100 U. S., at 308.

The principles and reasoning upon which this long line of decisions rests are sound. The need for their reaffirmation is present. The United States Commission on Civil Rights in its 1961 Report, Justice 103, after exhaustive study of the practice of discrimination in jury selection, concluded that "[t]he practice of racial exclusion from juries persists today even though it has long stood indicted as a serious violation of the 14th amendment." It is unthinkable, therefore, that the principles of *Strauder* and the cases following should be in any way weakened or undermined at this late date particularly when this Court has made it clear in other areas, where the course of decision has not been so uniform, that the States may not discriminate on the basis of race. Compare *Plessy* v. *Ferguson,* 163 U. S. 537, with *Brown* v. *Board of Education,* 347 U. S. 483; compare *Pace* v. *Alabama,* 106 U. S. 583, with *McLaughlin* v. *Florida,* 379 U. S. 184.

Regrettably, however, the Court today while referring with approval to *Strauder* and the cases which have followed, seriously impairs their authority and creates additional barriers to the elimination of jury discrimination practices which have operated in many communities to nullify the command of the Equal Protection Clause. This is evident from an analysis of the Court's holding as applied to the facts which are virtually undisputed.

Petitioner, a 19-year-old Negro, was indicted in Talladega County for the rape of a 17-year-old white girl, found guilty, and sentenced to death by an all-white jury. The petitioner established by competent evidence and without contradiction that not only was there no Negro on the jury that convicted and sentenced him, but also that no Negro within the memory of persons now living

has ever served on any petit jury in any civil or criminal case tried in Talladega County, Alabama. Yet, of the group designated by Alabama as generally eligible for jury service in that county, 74% (12,125) were white and 26% (4,281) were Negro.

Under well-established principles this evidence clearly makes out "a *prima facie* case of the denial of the equal protection which the Constitution guarantees." *Norris* v. *Alabama, supra,* at 591. The case here is at least as strong as that in *Norris* where

> "proof that Negroes constituted a substantial segment of the population of the jurisdiction, that some Negroes were qualified to serve as jurors, and that none had been called for jury service over an extended period of time, was held to constitute prima facie proof of the systematic exclusion of Negroes from jury service. This holding, sometimes called the 'rule of exclusion,' has been applied in other cases, and it is available in supplying proof of discrimination against any delineated class." *Hernandez* v. *Texas, supra,* at 480.

It is also at least as strong as the case in *Patton* v. *Mississippi, supra,* where the Court stated:

> "It is to be noted at once that the indisputable fact that no Negro had served on a criminal court grand or petit jury for a period of thirty years created a very strong showing that during that period Negroes were systematically excluded from jury service because of race. When such a showing was made, it became a duty of the State to try to justify such an exclusion as having been brought about for some reason other than racial discrimination." 332 U. S., at 466.

It is clear that, unless the State here can "justify such an exclusion as having been brought about for some rea-

son other than racial discrimination," *Patton* v. *Mississippi, ibid.,* this conviction "cannot stand." *Id.,* at 469. *Norris* v. *Alabama, supra,* at 596–598; *Arnold* v. *North Carolina, supra,* at 774. "Long continued omission of Negroes from jury service establishes a prima facie case of systematic discrimination. The burden of proof is then upon the State to refute it." *Harper* v. *Mississippi,* 251 Miss. 699, 707, 171 So. 2d 129, 132–133.[1]

Alabama here does not deny that Negroes as a race are excluded from serving on juries in Talladega County. The State seeks to justify this admitted exclusion of Negroes from jury service by contending that the fact that no Negro has ever served on a petit jury in Talladega County has resulted from use of the jury-striking system, which is a form of peremptory challenge. While recognizing that no Negro has ever served on any petit jury in Talladega County, that the method of venire selection was inadequate, that the prosecutor in this case used the peremptory challenge system to exclude all Negroes as a class, and that the systematic misuse by the State of a peremptory challenge system to exclude all Negroes from all juries is prohibited by the Fourteenth Amendment, the Court affirms petitioner's conviction on the ground that petitioner has "failed to carry" his burden of proof. The Court holds this because it believes the record is silent as to whether the State participated in this total exclusion of all Negroes in previous cases; it would require petitioner specifically to negative the possibility that total exclusion of Negroes from jury service in all other cases was produced solely by the action of defense attorneys.

I cannot agree that the record is silent as to the State's involvement in the total exclusion of Negroes from jury service in Talladega County. The Alabama Supreme

---

[1] See also *State* v. *Lowry,* 263 N. C. 536, 139 S. E. 2d 870.

Court found that "Negroes are commonly on trial venires but are always struck by attorneys in selecting the trial jury." 275 Ala. 508, 515, 156 So. 2d 368, 375. In response to a question concerning the operation of the jury-striking system, the Circuit Solicitor, the state prosecuting attorney, stated:

> "Sometimes, it depends on who is involved in a case. We have been very fortunate in this county, we have not had any white against black or black against white. If we have—where we have a situation arising in a case such as that, in the cases that we have had—we have had no capital felonies, but, we strike a jury different from what if it was two white men involved or two colored men."

This statement, it seems to me, plainly indicates that, at the very least, the State—"we"—participates, in Talladega County, in employing the striking or peremptory challenge system to exclude Negroes from jury service in cases where white men are involved.

Also, the state prosecuting attorney testified as follows:

> "Many times I have asked, Mr. Love for instance, I would say there are so many colored men on this jury venire, do you want to use any of them, and he would say, my client doesn't want them, or we don't see fit to use them. And then if I didn't see fit to use them, then we would take them off. We would strike them first, or take them off.
>
> .        .        .        .        .
>
> "If I am trying a case for the State, I will ask them what is their wish, do they want them [Negro jurors], and they will as a rule discuss it with their client, and then they will say, we don't want them. If we are not going to want them, if he doesn't want them, and if I don't want them, what we do then is just take them off. Strike them first."

These quotations show either that the State "many times" abandons even the facade of the jury-striking system and agrees with the defense to remove all Negroes as a class from the jury lists even before the striking begins, or that pursuant to an agreement the State directly participates in the striking system to remove Negroes from the venire. Indeed the Court recognizes that "[a]pparently in some cases, the prosecution agreed with the defense to remove Negroes." *Ante,* at 224–225. The Court, however, goes on to state that "[t]he record makes clear that this was not a general practice . . . ." *Ante,* at 225, n. 31. With all deference, it seems clear to me that the record statement quoted by the Court to support this conclusion, cuts against rather than in favor of the Court's statement and inference that the general practice was not to exclude Negroes by agreement between the prosecution and defense or by the State acting alone. The prosecutor, in the statement quoted by the court, denied that he had stated that Negro defendants "generally do not want" Negroes to serve on juries and stated that there had only "been occasion here where that has happened." *Ante,* at 225, n. 31. Since it is undisputed that no Negro has ever served on a jury in the history of the county, and a great number of cases have involved Negroes, the only logical conclusion from the record statement that only on occasion have Negro defendants desired to exclude Negroes from jury service, is that in a good many cases Negroes have been excluded by the state prosecutor, either acting alone or as a participant in arranging agreements with the defense.[2]

---

[2] I believe that the record shows that agreement between the State and the defense to exclude Negroes has occurred "many times." The Court itself admits that at least "in some cases, the prosecution agreed with the defense to remove Negroes." *Ante,* at 224–225. It concludes, however, that this is not sufficient on the ground that "[t]here is no evidence, however, of what the prosecution did or did not do *on its own account* in any cases other than the one at bar." *Ibid.* (Em-

Moreover, the record shows that in one case, the only one apparently in the history of the county where the State offered Negroes an opportunity to sit on a petit jury, the state prosecutor offered a Negro accused an all-Negro jury where the case involved an alleged crime against another Negro. The offer was refused but it tends to confirm the conclusion that the State joins in systematically excluding Negroes from jury service because it objects to any mixing of Negro and white jurors and to a Negro sitting in a case in which a white man is in any way involved.

Furthermore, the State concededly is responsible for the selection of the jury venire. As the Court recognizes, *ante,* at 205, the evidence showed that while Negroes represent 26% of the population generally available to be called for jury service in Talladega County, Negroes constituted a lesser proportion, generally estimated from 10% to 15%, of the average venire. The Alabama Supreme

phasis added.) This Court, however, has never held in any case involving racial discrimination under the Fourteenth Amendment that such discrimination is unconstitutional only if it is brought about by the State acting *alone.* The test which has been applied is whether the State "to some significant extent . . . has been . . . involved." *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722. See *Peterson* v. *Greenville,* 373 U. S. 244; *Lombard* v. *Louisiana,* 373 U. S. 267. "The vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied . . . rights merely because they are colored." *Terry* v. *Adams,* 345 U. S. 461, 473 (separate opinion of Mr. Justice Frankfurter). The State's agreement with the defense, which the record establishes, to remove Negroes from jury venires, under the Court's settled decisions meets the "state action" requirement of the Fourteenth Amendment. Under the principles of *Strauder* and the cases following, it constitutes "action of a State . . . through its . . . administrative officers" excluding persons "solely because of their race or color" from serving on juries. *Carter* v. *Texas, supra,* at 447.

Court noted that under state law "the jury commission is required to keep a roll containing the names of all male citizens living in the county who possess the qualifications prescribed by law and who are not exempted by law from serving on juries," 275 Ala., at 514, 156 So. 2d, at 374, and, in fact, this had not been done in Talladega County. The Alabama Supreme Court concluded that the method of jury selection in Talladega County was "not exhaustive enough to insure the inclusion of all qualified persons," *ibid.*, and this Court admits it is "imperfect," *ante,* at 209, and that "[v]enires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community." *Ante,* at 208. It may be, for the reasons stated by the Court, that this "haphazard" method of jury selection standing alone as an alleged constitutional violation does not show unlawful jury discrimination. However, this method of venire selection cannot be viewed in isolation and must be considered in connection with the peremptory challenge system with which it is inextricably bound. When this is done it is evident that the maintenance by the State of the disproportionately low number of Negroes on jury panels enables the prosecutor, alone or in agreement with defense attorneys, to strike all Negroes from panels without materially impairing the number of peremptory challenges available for trial strategy purposes.

Finally, it is clear that Negroes were removed from the venire and excluded from service by the prosecutor's use of the peremptory challenge system in this case and that they have never served on the jury in any case in the history of the county. On these facts, and the inferences reasonably drawn from them, it seems clear that petitioner has affirmatively proved a pattern of racial discrimination in which the State is significantly involved, cf. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722;

*Lombard* v. *Louisiana,* 373 U. S. 267; *Peterson* v. *Greenville,* 373 U. S. 244, or for which the State is responsible, cf. *Terry* v. *Adams,* 345 U. S. 461, 473. As this Court held in *Strauder,* systematic exclusion of Negroes from jury service constitutes a brand of inferiority affixed upon them and state involvement in affixing such a brand is forbidden by the Fourteenth Amendment.

There is, however, a more fundamental defect in the Court's holding. Even if the Court were correct that the record is silent as to state involvement in previous cases in which Negroes have been systematically excluded from jury service, nevertheless, it is undisputed that no Negro has ever served on any petit jury in the history of Talladega County. Under *Norris, Patton* and the other cases discussed above, it is clear that petitioner by proving this made out a prima facie case of unlawful jury exclusion. The burden of proof then shifted to the State to prove, if it could, that this exclusion was brought about for some reason other than racial discrimination in which the State participated.

This established principle is well illustrated by the recent decision of the Mississippi Supreme Court, *Harper* v. *Mississippi, supra,* in which that court rejected an argument of the State of Mississippi strikingly similar to the one advanced here by the State of Alabama and accepted by this Court. In the Mississippi case a Negro defendant made out a prima facie case of jury exclusion by showing that only a token number of Negroes had served on juries in the county in question. The State attempted to rebut this prima facie case by contending that the exclusion resulted from a perfectly neutral system of employing voting registration lists to select prospective jurors and the fact that the number of Negroes selected was in proportion to their number on the voting registration lists. The Mississippi Supreme Court held, however, that this did not rebut the prima facie case of jury exclusion unless

the State could additionally prove that the dispropor-tionately low number of Negroes on the voting registra-tion list was caused by factors other than state-involved racial discrimination. Similarly, in the instant case, it seems to me indisputable that Alabama did not rebut petitioner's prima facie case, which here is based on a showing of total exclusion, by the contention that it is the result of a neutral peremptory challenge system unless the State additionally proved that the peremptory challenge system is not being used in a way constituting state-involved discrimination. That it did not do so is uncontested.

Despite the fact that the petitioner therefore has made out what is, under the settled decisions of this Court, a prima facie case of jury exclusion which the State has not rebutted, the Court today affirms petitioner's conviction because, according to the Court, petitioner has "failed to carry" his burden of proof. *Ante,* at 226. The Court con-cedes that if this case involved exclusion of Negroes from jury panels, under *Norris* and *Patton* a prima facie case of unconstitutional jury exclusion would be made out. However, the Court argues that because this case involves exclusion from the jury itself and not from the jury venire, the burden of proof on a defendant should be greater. This distinction is novel to say the least.

The Court's jury decisions, read together, have never distinguished between exclusion from the jury panel and exclusion from the jury itself. Indeed, no such distinc-tion can be drawn. The very point of all these cases is to prevent that deliberate and systematic discrimination against Negroes or any other racial group that would pre-vent them, not merely from being placed upon the panel, but from serving on the jury. The Court quotes from *Hernandez* v. *Texas, supra,* to show that the prima facie rule applies only where no Negro *"had been called* for jury service," *ante,* at 226, but such a view is rejected by

*Patton's* statement of the rule, for *Patton* held that a prima facie case was made out when it was shown that "no Negro had *served* on a criminal court grand or petit jury for a period of thirty years." 332 U. S., at 466. (Emphasis added.) And, *Patton* is confirmed by our very recent cases, *Eubanks* v. *Louisiana, supra,* and *Arnold* v. *North Carolina, supra,* which also speak only in terms of jury "service" and jury "duty." "The exclusion of otherwise eligible persons from jury *service* solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment." *Hernandez* v. *Texas, supra,* at 479. (Emphasis added.)

The rule of exclusion set forth in these cases is a highly pragmatic one. It is designed to operate in jury cases so that once the defendant has made a showing of total exclusion, the burden of going forward with the evidence is placed upon the State, the party in the better position to develop the facts as to how the exclusion came about. The defendant is a party to one proceeding only, and his access to relevant evidence is obviously limited. The State is a party to all criminal cases and has greater access to the evidence, if any, which would tend to negative the State's involvement in discriminatory jury selection. The burden of proof rule developed in *Norris, Patton,* and other cases, which until today the Court has uniformly applied, is a simple and workable one designed to effectuate the Constitution's command. This is demonstrated by our past cases, as well as state cases.[3] Because the same factors—availability of evidence, simplicity, and workability—exist whether exclusion from the jury panel or exclusion from the jury itself is involved, to apply the prima facie rule of *Norris* and *Patton* to this case is neither "blind" nor "wooden," but is realistic and sensible.

---

[3] See *Harper* v. *Mississippi, supra; State* v. *Lowry, supra.*

I agree with the Court that it is a reasonable inference that the State is involved in unconstitutional discrimination where total exclusion of Negroes from all venires is established. I believe that it is also a reasonable inference that the State is involved where, although some Negroes are on venires, none has ever served on a jury, cf. *Eubanks* v. *Louisiana, supra; Arnold* v. *North Carolina, supra,* and the State in the case at bar has excluded from jury service the Negroes on the venire by exercise of its peremptory challenges. The Court in *Patton* and in other cases rejected the State's argument, and held that it would be unreasonable to assume where Negroes were totally excluded from venires that this came about because all Negroes were unqualified, unwilling, or unable to serve. It would be similarly unreasonable to assume where total exclusion from service has been established and the prosecutor has used peremptory challenges to exclude all Negroes from the jury in the given case that in all previous cases Negroes were excluded solely by defense attorneys without any state involvement. If the instant case is really a unique case, as the Court implies, surely the burden of proof should be on the State to show it.

Finally, the Court's reasoning on this point completely overlooks the fact that the total exclusion of Negroes from juries in Talladega County results from the interlocking of an inadequate venire selection system, for which the State concededly is responsible, and the use of peremptory challenges. All of these factors confirm my view that no good reason exists to fashion a new rule of burden of proof, which will make it more difficult to put an end to discriminatory selection of juries on racial grounds and will thereby impair the constitutional promise of "Equal Protection of the Laws," made effective by *Strauder* and the cases which follow it. By undermining the doctrine of the prima facie case while paying lip service to

*Strauder* the Court today allies itself with those "that keep the word of promise to our ear and break it to our hope."

The Court departs from the long-established burden of proof rule in this area, and imposes substantial additional burdens upon Negro defendants such as petitioner, because of its view of the importance of retaining inviolate the right of the State to use peremptory challenges. I believe, however, that the preference granted by the Court to the State's use of the peremptory challenge is both unwarranted and unnecessary.

To begin with, the peremptory challenge has long been recognized primarily as a device to protect *defendants.* As stated by Blackstone in a passage quoted with approval by this Court:

> "[I]n criminal cases, or at least in capital ones, there is, *in favorem vitae,* allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all; which is called a *peremptory* challenge: a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous. This is grounded on two reasons.
>
> "1. As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is, that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice, even without being able to assign a reason for such his dislike.
>
> "2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference

may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside." 4 Bl. Comm. 353.

Quoted with approval in *Lewis* v. *United States,* 146 U. S. 370, 376; see also *United States* v. *Marchant,* 12 Wheat. 480, 482.

Indeed in England, as the Court points out, *ante,* at 212-213, although the Crown at early common law had an unlimited number of peremptory challenges, as early as 1305 that right was taken away, and since that time in England peremptories may be exercised only by the defendant. Orfield, Criminal Procedure From Arrest to Appeal 355 (1947). Harris, Criminal Law 443 (20th ed. 1960).[4] It appears that in modern times peremptories are rarely used in England, even by defendants. *Ibid.*

While peremptory challenges are commonly used in this country both by the prosecution and by the defense, we have long recognized that the right to challenge peremptorily is not a fundamental right, constitutionally guaranteed, even as applied to a defendant, much less to the State. *Stilson* v. *United States,* 250 U. S. 583. This Court has sanctioned numerous incursions upon the right to challenge peremptorily. Defendants may be tried together even though the exercise by one of his right to

---

[4] The Crown's right to challenge peremptorily was removed in that year by 33 Edw. 1, Stat. 4, because the King's right to challenge without showing cause "was mischievous to the subject, tending to infinite delayes and danger." Coke on Littleton 156 (14th ed. 1791). Since 33 Edw. 1, Stat. 4, the Crown can only require jurors whom it wishes to challenge to stand aside from the panel until the defendant has exercised all his challenges. Then, if a jury has not been selected, the jurors, who have been "stood aside" will be used unless the Crown can challenge them for cause. Orfield, *supra,* at 356, Harris, *supra,* at 443, III Bacon's Abridgment 764 (5th ed. 1798). Even this limited procedure as the Court notes, *ante,* at 213, n. 12, however, is rarely used today. Orfield, *supra,* at 355; Harris, *supra,* at 443.

challenge peremptorily may deprive his codefendant of a juror he desires or may require that codefendant to use his challenges in a way other than he wishes. *United States* v. *Marchant, supra.* A defendant may be required to exercise his challenges prior to the State, so that some may be wasted on jurors whom the State would have challenged. *Pointer* v. *United States,* 151 U. S. 396. Congress may regulate the number of peremptory challenges available to defendants by statute and may require codefendants to be treated as a single defendant so that each has only a small portion of the number of peremptories he would have if tried separately. *Stilson* v. *United States, supra.* In *Stilson* this Court stated, "There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impartial jury is all that is secured." 250 U. S., at 586. The Fourteenth Amendment would impose no greater obligation upon the States. Today this Court reverses *Stilson's* maxim, in effect holding that "There is nothing in the Constitution of the United States which requires the State to grant trial by an impartial jury so long as the inviolability of the peremptory challenge is secured."

Were it necessary to make an absolute choice between the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment and the right to challenge peremptorily, the Constitution compels a choice of the former. *Marbury* v. *Madison,* 1 Cranch 137, settled beyond doubt that when a constitutional claim is opposed by a nonconstitutional one, the former must prevail. But no such choice is compelled in this situation. The holding called for by this case, is that where, as here, a Negro defendant proves that Negroes constitute a substantial segment of the population, that Negroes are qualified to serve as jurors, and

that none or only a token number [5] has served on juries over an extended period of time, a prima facie case of the exclusion of Negroes from juries is then made out; that the State, under our settled decisions, is then called upon to show that such exclusion has been brought about "for some reason other than racial discrimination," *Patton* v. *Mississippi, supra,* at 466; and that the State wholly fails to meet the prima facie case of systematic and purposeful racial discrimination by showing that it has been accomplished by the use of a peremptory challenge system unless the State also shows that it is not involved in the misuse of such a system to prevent all Negroes from ever sitting on any jury. Such a holding would not interfere with the rights of *defendants* to use peremptories, nor the right of the State to use peremptories as they normally and traditionally have been used.

It would not mean, as the Court's prior decisions, to which I would adhere, make clear, that Negroes are entitled to proportionate representation on a jury. *Cassell* v. *Texas, supra,* at 286–287 (opinion of Mr. Justice Reed). Nor would it mean that where systematic exclusion of Negroes from jury service has not been shown, a prosecutor's motives are subject to question or judicial inquiry when he excludes Negroes or any other group from sitting on a jury in a particular case. Only where systematic exclusion has been shown, would the State be called upon to justify its use of peremptories or to negative the State's involvement in discriminatory jury selection.

This holding would mean, however, that a conviction cannot stand where, as here, a Negro defendant, by showing widespread systematic exclusion, makes out a prima facie case of unconstitutional discrimination which the

---

[5] See *Cassell* v. *Texas, supra; Harper* v. *Mississippi, supra.*

State does not rebut. Drawing the line in this fashion, in my view, achieves a practical accommodation of the constitutional right and the operation of the peremptory challenge system without doing violence to either.

I deplore the Court's departure from its holdings in *Strauder* and *Norris.* By affirming petitioner's conviction on this clear record of jury exclusion because of race, the Court condones the highly discriminatory procedures used in Talladega County under which Negroes never have served on any petit jury in that county. By adding to the present heavy burden of proof required of defendants in these cases, the Court creates additional barriers to the elimination of practices which have operated in many communities throughout the Nation to nullify the command of the Equal Protection Clause in this important area in the administration of justice. See 1961 United States Commission on Civil Rights Report, Justice 81–103.

I would be faithful to the teachings of this Court in its prior jury exclusion cases and the view, repeatedly expressed by this Court, that distinctions between citizens solely because of their race, religion, or ancestry, are odious to the Fourteenth Amendment. I would reaffirm and apply here what this Court said in *Smith* v. *Texas, supra,* at 130:

> "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. . . . The fact that the written words of a state's laws hold out a promise that no such discrimi-

nation will be practiced is not enough. The Fourteenth Amendment requires that equal protection to all must be given—not merely promised."

Applying these principles, I would reverse. This, of course, would "not mean that a guilty defendant must go free." *Patton* v. *Mississippi, supra,* at 469; see *Hill* v. *Texas, supra,* at 406. For, as the Court pointed out in *Patton* v. *Mississippi, supra,* at 469, the State, if it so desired, could retry petitioner by a jury "selected as the Constitution commands."